**BLUEBONNET SAVINGS BANK, F.S.B., and Stone Capital, Inc. (formerly known as CFSB Corporation), Plaintiffs–Appellees,**

**and**

**James M. Fail, Plaintiff–Appellee,**

v.

**UNITED STATES, Defendant–Appellant.**

**No. 02–5123.**

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 7, 2003.

Mitchell R. Berger, Patton Boggs LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Michael J. Schaengold and Ugo Colella. Also on the brief was I. Thomas Beiging, Beiging, Shapiro & Burrus LLP, of Denver, Colorado for Bluebonnet Savings Bank, F.S.B. Stone Capital, Inc. (formerly known as CFSB Corporation).

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; Jeanne E. Davidson, Deputy Director; Elizabeth M. Hosford, Kenneth Dintzer, and Tonia J. Tornatore, Trial Attorneys.

Before MAYER, Chief Judge, RADER and BRYSON, Circuit Judges.

PER CURIAM.

The United States appeals from the judgment of the United States Court of Federal Claims awarding damages of $132,398,200 to plaintiff James M. Fail for the government's breach of contract. *Bluebonnet Sav. Bank, FSB v. United States*, 52 Fed.Cl. 75 (2002). The Court of Federal Claims interpreted our previous opinion in this case as requiring entry of a damages award for plaintiff in that amount, with no further factual analysis by the trial court. In this opinion, we clarify that our prior opinion was not meant to foreclose any further inquiry by the Court of Federal Claims into the issue of damages. We therefore vacate the judgment

and remand to allow the trial court to conduct such proceedings as that court deems necessary to determine the proper quantum of damages.

## I

This case is one of a number of "Winstar" cases arising from the savings and loan crisis of the 1980s. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The Federal Home Loan Bank Board sought to address the crisis by inducing private parties to bail out failed savings and loan institutions, or "thrifts," mainly in Texas and other southwestern states. Pursuant to that program, plaintiff James M. Fail and other investors acquired a group of failing thrifts and merged them into Bluebonnet Savings Bank, FSB. As part of the agreement to acquire the thrifts, Mr. Fail and his thrift holding company, CFSB Corporation, agreed to infuse $120 million into Bluebonnet over a two-year period. In return, the government agreed to provide approximately $3 billion in cash assistance to Bluebonnet and to grant Bluebonnet regulatory forbearances through the Federal Home Loan Bank Board. The forbearances included permitting Bluebonnet (1) to operate with reduced capital level requirements, (2) to pay dividends as long as Bluebonnet maintained those capital level requirements, and (3) to treat subordinated debt as regulatory capital.

In 1989, however, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). The new statute and its regulations limited Bluebonnet's ability to pay dividends and increased Bluebonnet's capital level requirements. Mr. Fail, CFSB Corporation (now renamed Stone Capital, Inc.), and Bluebonnet filed suit charging that the enforcement of FIRREA and its regulations had the effect of breaching the contract offering regulatory forbearances.

The plaintiffs claimed that as a result of the breach they experienced increased costs in financing their required cash infusions into Bluebonnet.

Mr. Fail had financed part of the initial cash infusion through short-term loans from financier Robert Shaw. Mr. Fail continued borrowing money from Mr. Shaw and allowing the loans to roll over until a total of $140 million in short-term loans from Mr. Shaw came due in 1992. Unable to secure long-term financing and facing default on the short-term loans, Mr. Fail entered into a more complex financing agreement with Mr. Shaw, which was referred to as the Economic Benefits Agreement ("EBA"). Under the EBA, Mr. Fail agreed to pay approximately $59 million to Mr. Shaw up front. Mr. Shaw agreed to provide long-term financing for the remaining $81 million due on the short-term loans in exchange for receiving a 49 percent equity interest in CFSB's profits. The plaintiffs contended that if there had been no breach Mr. Fail would have been able to obtain all-debt financing through long-term loans at an interest rate of 13.5 percent. The plaintiffs thus sought two categories of damages: those damages related to the EBA, which flowed from the relinquishment of the 49 percent equity interest in CFSB; and those damages not related to the EBA, which resulted from the increased loan interest and lender fees that plaintiffs had to pay as a result of the breach. The value of the equity interest that Mr. Fail relinquished is reflected in a document called the Memo Account.

The Court of Federal Claims granted partial summary judgment for the plaintiffs on the issue of liability, *see Bluebonnet Sav. Bank, FSB v. United States*, 43 Fed.Cl. 69 (1999), and conducted a trial to establish the extent of the damages. Following the trial, the court denied the plaintiffs' request for damages in its entirety

and entered judgment for the government. *See Bluebonnet Sav. Bank, FSB v. United States,* 47 Fed.Cl. 156 (2000). While the court held that increased financing costs were foreseeable and that the breach caused the plaintiffs to incur increased financing costs, the court concluded that it could not determine the amount of that increase with reasonable certainty. As part of that decision, the court ruled that the Memo Account was not a reliable basis for establishing the plaintiffs' actual EBA-related costs, i.e., the value of the equity interest surrendered to Mr. Shaw as part of the EBA.

On appeal, this court reversed in part. *See Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348 (Fed.Cir.2001). We upheld the trial court's findings that increased financing costs were foreseeable and that the government's breach caused the plaintiffs to incur increased costs. We also upheld the trial court's rejection of the plaintiffs' claim for what were referred to as "non-EBA-related damages." We agreed with the court's conclusion that the plaintiffs had failed to establish those damages to a reasonable certainty, inasmuch as there was no evidence that the plaintiffs would have obtained long-term loans at the assumed rate of 13.5 percent. However, we reversed the conclusion of the trial court that the Memo Account did not provide a fair and reasonable basis from which to assess the EBA-related costs. We remanded the case for the trial court "to formulate an appropriate award of EBA-related damages as determined by the payments already made by Fail to Shaw under the EBA, and the value of the EBA debt as calculated in the Memo [Account]." *Id.* at 1358.

On remand, the Court of Federal Claims declined to reopen the record. Noting that "[t]he Federal Circuit held that Bluebonnet persuasively argued that it was entitled to the entire cost of the EBA as an award of damages," the court stated that it "interprets the Federal Circuit's mandate to require that the court add the $5,400,392 [paid to Mr. Shaw under the EBA] to the $126,997,808, which represents the value of the EBA debt as calculated in the Memo [Account], in order to arrive at the damage award in this case. The court is constrained by the mandate of the Federal Circuit." *Bluebonnet Sav. Bank, FSB v. United States,* 52 Fed.Cl. 75, 77 (2002). The court therefore awarded a judgment of $132,398,200 to Mr. Fail. The government appeals from that judgment.

## II

This appeal turns on the proper interpretation of our prior opinion in this case, and in particular the extent to which our mandate prohibited the trial court from conducting further proceedings on remand to determine the proper damages award. The plaintiffs contend that the trial court was correct in concluding that our prior opinion required the court to enter judgment in the amount of the full value of the EBA-related costs, as memorialized in the Memo Account, without further analysis or calculations. The government, on the other hand, argues that our opinion simply held that the Memo Account was an appropriate basis for determining the actual EBA-related costs and left it to the trial court to use that evidence, along with any other relevant evidence, to arrive at a fair and reasonable damages award. In formulating the damages award, the government contends, the trial court erred in awarding Mr. Fail the full value of the EBA-related costs, and not adjusting the award by subtracting the financing costs that the plaintiffs would have incurred had there been no breach.

 One of the basic principles of contract damages is that "damages for breach of contract shall place the wronged party

in as good a position as it would have been in, had the breaching party fully performed its obligation." *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed.Cir.1997). Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach. *White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed.Cir.2002). The plaintiffs do not disagree with that principle but contend that the EBA-related costs absent a breach would have been zero and that our prior opinion so held. The plaintiffs rely on several statements in our prior opinion that the trial court regarded as requiring the entry of damages in the amount of the full value of the EBA-related costs and barring further consideration of damages.

Both sides thus continue to take an all-or-nothing approach on appeal. The government argues that the plaintiffs should receive no damages because they have not proved the costs they would have incurred absent a breach, while the plaintiffs contend that they are entitled to the full value of the equity interest relinquished as part of the EBA because they would not have relinquished equity absent a breach and thus the EBA-related costs they would have incurred absent a breach are zero.

■ We do not accept either of those extreme positions. In our prior opinion in this case, we rejected the trial court's ruling that the Memo Account was not a sufficiently reliable basis for calculating the costs resulting from the plaintiffs' surrender of equity as part of the EBA. For that reason, the trial court was justified in concluding, as it did, that the actual costs resulting from that portion of the EBA totaled $132,398,200. But that does not mean that damages should necessarily be awarded in that amount. To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach.

It has been determined that the plaintiffs would not have entered into the EBA but for the breach, that "dividend financing would have been available," and that "it would have been unnecessary [for the plaintiffs] to give up a significant equity stake in CFSB to obtain financing." *Bluebonnet*, 266 F.3d at 1356. From that, the plaintiffs argue not only that they are entitled to the entire amount of the EBA-related costs, i.e., the value of the equity interest conveyed to Mr. Shaw, but also that the EBA-related costs in the absence of a breach would have been zero. The fact that the plaintiffs would not have needed to give up a significant equity interest in the absence of a breach does not mean that the amount of the EBA-related damages should necessarily be the full amount of the value of the equity interest transferred to Mr. Shaw, or $132,398,200. Because the surrender of equity as part of the EBA constituted a substantial conveyance of value to Mr. Shaw, it may be that the other terms of the EBA through which the plaintiffs obtained long-term loans from Mr. Shaw were more favorable than the financing arrangement they would have been able to achieve absent a breach. If that is so, the proper damages award would be less than the full $132,398,200 value of the transferred equity interest. While that issue may be difficult to resolve, it is necessary for the trial court to make such a determination in order to ensure that the $132,398,200 sought by the plaintiffs does not represent an overstatement of the loss fairly attributable to the breach.

Much of our prior opinion was directed to the question whether the Memo Account provided an adequate basis from which to calculate the loss attributable to the trans-

fer of equity in the EBA. Ruling that it was "inappropriate to require CFSB to justify the basis for each term in the [Memo Account]," we concluded that the trial court should formulate its award of damages based on the total value of the EBA equity transfer as reflected in the Memo Account and the payments already made on Shaw's equity interest. *Bluebonnet*, 266 F.3d at 1357–58. However, we did not address the amount, if any, by which that value should be reduced to obtain an accurate value for the ultimate damages award. We did not intend for our mandate to foreclose the trial court from conducting any further inquiry into the proper amount of the damages to be awarded in this case. Instead, our intention was to allow the trial court to consider damages consistent with the principles set forth in the opinion to evaluate the net financial effect of breach.

Accordingly, while it was proper for the trial court to begin its damages analysis on remand by treating the entire $132,398,200 in surrendered equity as a cost resulting from the breach, that does not end the matter. It is necessary for the court to make a further determination as to what costs, if any, the plaintiffs would have incurred in the absence of breach and thus to ascertain the net financial effect of the breach on the plaintiffs. While we believe a remand is required for the trial court to conduct the inquiry into the but-for financing costs, we again reject the government's argument that it should pay no damages at all. We reiterate the point made in our prior opinion that, at a minimum, jury verdict damages would be appropriate in this case.

We recognize that, although the parties and the courts have separated the costs in this case into EBA-related costs and non-EBA-related costs, that distinction is somewhat artificial and may have resulted in some lack of certainty in the proper analysis to be applied to the damages issue in this case. We now ask the trial court to consider the alternatives to the equity arrangement in the EBA that the plaintiffs would have faced if there had been no breach. That determination should be made without regard to whether the "but-for" costs in question would be considered EBA-related costs or non-EBA-related costs.

Given the complexity of the case and the trial court's intimate familiarity with the facts, we are confident that the trial court is in the best position to examine the question whether there are "but-for" costs that would have been incurred absent breach and should be used to offset the EBA-related cost of $132,398,200, and if so how much those costs should be. Because of our confidence that the trial court was in the best position to make the factual determinations necessary to establish an appropriate damages award, we did not mean for our prior mandate to prevent the trial court judge from conducting further factual analysis on remand. We continue to believe that the trial court is in the best position to make the necessary findings on this complex issue and to determine whether, and by how much, the EBA-related cost of $132,398,200 should be offset in order to obtain as accurate an assessment as possible of the true injury caused by the breach. We therefore vacate the judgment and remand the case to allow the trial court to use whatever means it deems appropriate, including reopening the record if necessary, to assess the net effect of the breach.

*VACATED and REMANDED.*