**HANSEN BANCORP, INC., Elmer F. Hansen, Jr., and G. Eileen Hansen, Plaintiffs–Appellants,**

**v.**

**UNITED STATES, Defendant– Cross Appellant.**

**Nos. 03–5029, 03–5061.**

United States Court of Appeals, Federal Circuit.

May 11, 2004.

David L. Braverman, Braverman Daniels Kaskey Ltd., of Philadelphia, Pennsylvania, argued for plaintiffs-appellants. With him on the brief was Richard E. Miller.

William G. Kanellis, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Gregory R. Firehock and Elizabeth M. Hosford, Trial Attorneys.

Before SCHALL, BRYSON, and LINN, Circuit Judges.

SCHALL, Circuit Judge.

This is a *Winstar*-related case. In *Hansen Bancorp, Inc. v. United States*, 49 Fed. Cl. 168 (2001) (*"Hansen I "*), the United States Court of Federal Claims ruled that a contract existed between Elmer F. Hansen, Jr., G. Eileen Hansen (together, "the Hansens"), and Hansen Bancorp, Inc. ("Hansen Bancorp"), on the one hand, and the United States, on the other hand. *Id.* at 174–75. The court further ruled that through the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in scattered provisions at 12 U.S.C. and 26 U.S.C.) ("FIRREA"), and its implementing regulations, the United States breached that contract. *Hansen I*, 49 Fed. Cl. at 177–78. After entering judgment of liability in favor of the Hansens, the court conducted proceedings on damages, in which the parties submitted cross-motions for summary judgment. On July 26, 2002, the court ruled that the United States' breach

of contract had been total and awarded the Hansens $1 million in restitution damages. *Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92, 110–11 (2002) (*"Hansen II"*). That sum represents the capital contribution the Hansens made when Hansen Bancorp assumed ownership of Hansen Savings Bank, SLA ("Hansen Savings"), a newly formed thrift institution, as part of a transaction supervised by federal banking authorities.

The Hansens now appeal,[1] while the United States cross-appeals. In their appeal, the Hansens challenge the Court of Federal Claims' rejection of their claim for restitution damages for the value of the stock of Raritan Valley Savings and Loan Association ("Raritan") that they exchanged for stock of Hansen Bancorp when Hansen Bancorp assumed ownership of Hansen Savings. For its part, the United States urges reversal of the court's ruling that its contract with the Hansens and Hansen Bancorp was totally breached. The United States also challenges the court's rejection of its contention that a $1.2 million dividend paid to the Hansens by Hansen Bancorp should be offset against any award of restitution to the Hansens.

Because we conclude that the Court of Federal Claims erred in ruling on summary judgment that a total breach of contract occurred, the judgment in favor of the Hansens is vacated. The case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I.

The thrift crisis of the early 1980s is a now-familiar backdrop to *Winstar* litiga-

tion. An account of the devastating collapse of the savings and loan industry, culminating in the enactment of FIRREA, has been extensively recounted in opinions of both the Supreme Court and this court. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 843–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar IV"*); *Anderson v. United States*, 344 F.3d 1343, 1345–47 (Fed.Cir.2003); *Castle v. United States*, 301 F.3d 1328, 1332–33 (Fed.Cir. 2002); *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1369–71 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1376–77 (Fed.Cir. 2001). A brief summary of this history may provide context for this particular *Winstar*-related dispute.

Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions ("thrifts"). To attract new deposits, thrifts had to offer interest rates that far exceeded the income the thrifts were receiving from mortgage agreements previously entered into at lower rates. *Castle*, 301 F.3d at 1332. This deficit cash flow predictably undermined the stability of many thrifts. The growing number of troubled thrifts threatened to exhaust the funds of the Federal Savings and Loan Insurance Corporation ("FSLIC") that had been set aside for the reimbursement of depositors. To deal with this crisis, the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), the agency charged with channeling funds to the thrift industry, *Winstar IV*, 518 U.S. at 844, 116 S.Ct. 2432, solicited private investors to purchase failing thrifts in "supervisory merger" transactions. *Landmark*, 256 F.3d at 1370. In exchange for investors assuming the liabilities of a fail-

---

**1.** Although Hansen Bancorp is named in the notice of appeal, it does not urge any argu- ments on appeal different from those made by the Hansens.

ing thrift, the Bank Board would permit the acquiring investors to allocate any shortfall between liabilities and real assets to an intangible asset known as "supervisory goodwill." *Id.* The acquiring investors benefited from two aspects of supervisory goodwill: it could be used to meet a new or restructured thrift's regulatory capital requirements, and it could be amortized over an extended period of time. *Glendale*, 239 F.3d at 1377.

Despite the superficial appeal of supervisory mergers, these arrangements could not rescue the industry and the FSLIC from a worsening crisis. *Anderson*, 344 F.3d at 1346. In 1989, Congress intervened by enacting FIRREA. As part of an extensive reformation of the savings and loan industry, FIRREA mandated minimum capital requirements and prohibited the use of supervisory goodwill. *Id.* No longer able to rely on supervisory goodwill, many thrifts could not comply with FIRREA's capital requirements and were seized by regulators.

These events gave rise to hundreds of lawsuits by the acquirers of ailing thrifts. Plaintiffs alleged that, by enacting FIRREA, the government breached contracts with the thrifts in which it had promised particular accounting treatment in connection with regulatory capital requirements. *Id.* In *United States v. Winstar*, the Supreme Court ruled that the terms of supervisory merger agreements were indeed enforceable against the government. *Winstar IV*, 518 U.S. at 842, 116 S.Ct. 2432. The Court left the extent of the government's liability under each agreement to be determined on a case-by-case basis. *Id.* at 909, 116 S.Ct. 2432 (limiting the Court's holding to liability for breach of contract).

## II.

The Hansens were among the many private investors who negotiated supervisory merger agreements with the FSLIC. In 1987, the Hansens submitted a successful bid to merge Raritan, the bank they owned, with a severely insolvent thrift, First Federal Savings and Loan of Hammonton ("Hammonton"). *Hansen I*, 49 Fed.Cl. at 170. Raritan was then a healthy thrift institution, allegedly with real assets of approximately $198 million and positive capital of roughly $15 million. Hammonton, at that time, had a negative net worth of approximately $102 million.

A May 25, 1988 agreement between the Hansens and the FSLIC called for the merger of Raritan and Hammonton into a new thrift, Hansen Savings. Hansen Savings would be owned by an intermediary company, Hansen Bancorp, which, in turn, would be wholly owned by the Hansens. The agreement was embodied in several integrated documents: (1) an Assistance Agreement, dated May 25, 1988, signed by representatives of the FSLIC, Raritan, Hansen Bancorp, and by the Hansens as individuals (the "Assistance Agreement"); (2) a Forbearance Letter, dated May 25, 1988, from the FHLBB to Joseph Paparatto, President and Chief Executive Officer of Raritan (the "Forbearance Letter"); (3) FHLBB Resolution No. 88–406, dated May 24, 1988, approving the supervisory merger (the "FHLBB Resolution"); and (4) an Opinion Letter, dated September 22, 1988, from Peat Marwick Main & Co. to the Supervisory Agent of the Federal Home Loan Bank of New York. *Id.* These documents were integrated into a single binding contract. *Id.* The integration clause of the Assistance Agreement, section 24, incorporated by reference contemporaneous documents and letters issued by the Bank Board and the FSLIC.

The Hansens were required to commit both cash and stock to the Raritan–Ham-

monton merger. Thus, under the Assistance Agreement, the Hansens were obligated to contribute, either directly or through Hansen Bancorp, $1 million to the merged entity, Hansen Savings. At the same time, the FHLBB Resolution required that the Hansens execute a "Stock Transfer Stipulation" as a condition of the agreement. This was accomplished through an agreement (the "Stock Exchange Agreement") that required the Hansens to exchange the entirety of their holdings in Raritan for shares in Hansen Savings, at a 1:60 rate of exchange.[2] *Hansen II*, 53 Fed.Cl. at 96.

In return for this performance by the Hansens, the FSLIC agreed to infuse $62 million into Hansen Savings. *Id.* Taking into account Hammonton's extensive liabilities, this contribution would leave Hansen Savings with a net liability of $40,485,069. *Hansen I*, 49 Fed.Cl. at 171. A deficit of this size would render Hansen Savings immediately insolvent. The terms of the agreement, however, avoided this result: Hansen Savings was permitted to write off the $40 million as "supervisory goodwill," amortizing the asset via straight-line depreciation over twenty-five years. *Id.* Pursuant to the Forbearance Letter, the FHLBB promised that it would forbear from regulatory action that would disallow this special accounting treatment or enforce regulatory capital requirements against Hansen Savings. The FSLIC also agreed to reimburse Hansen Savings for losses in excess of $5 million on the required sale of certain of Hammonton's so-called "covered assets."[3] *Hansen II*, 53 Fed.Cl. at 96.

FIRREA prevented Hansen Savings from amortizing the supervisory goodwill from the Hammonton transaction and from meeting its minimum capital requirements.[4] Hansen Savings ultimately became insolvent; in January of 1992, it was placed in receivership by the government. *Id.*

## III.

On December 3, 1992, the Hansens and Hansen Bancorp filed suit in the Court of Federal Claims. In the action, the Hansens sought to recover the $1 million they contributed to Hansen Savings under the Assistance Agreement. They also sought to recover the value of the Raritan stock they exchanged for shares of Hansen Savings under the Stock Exchange Agreement.[5] According to their complaint, the enactment of FIRREA breached the government's contractual commitment "to forbear from certain regulatory action, to recognize supervisory goodwill for all regulatory capital purposes and to permit

---

2. The Hansens owned all outstanding shares (50,006) of the capital stock of Raritan. They assert that, at the time of the Raritan–Hammonton merger, their Raritan stock was worth approximately $19 million.

3. This term referred to Hammonton's non-earning assets.

4. Under FIRREA, thrifts were required to "maintain core capital in an amount not less than 3 percent of the savings association's total assets." *Winstar IV*, 518 U.S. at 857, 116 S.Ct. 2432 (citing 12 U.S.C. § 1464(t)(2)(A)). It specifically excluded "un-identifiable intangible assets," such as supervisory goodwill, from the definition of core capital. *Id.* (citing § 1464(t)(9)(A)). Thus, a bank like Hansen Savings, considered solvent in the period prior to FIRREA, could immediately be rendered insolvent after FIRREA's enactment, though its assets and liabilities remained the same.

5. All other claims originally asserted by the Hansens in their complaint have either been dismissed or withdrawn.

amortization of supervisory goodwill over twenty-five years . . . ." Compl. ¶ 25.

Like all cases similarly situated, the Hansens' suit was stayed pending the decision of the Supreme Court in *Winstar IV*. In *Winstar IV*, the Court affirmed the decision of this court in *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (en banc) ("*Winstar III* "), that "the United States [was] liable to respondents [three thrifts] for breach of contract." 518 U.S. at 910, 116 S.Ct. 2432. The contracts at issue in *Winstar* permitted three thrift institutions to meet regulatory capital requirements by using a " 'fictional asset' called 'supervisory goodwill' that represented the excess of the thrift's liabilities over its assets," and to amortize that "asset" over a substantial period. *FDIC v. United States*, 342 F.3d 1313, 1315 (Fed. Cir.2003) (quoting *Landmark*, 256 F.3d at 1370). When the *Winstar IV* stay was lifted, proceedings in this case were limited to (1) whether a contract existed between the parties, and (2) whether the government was properly liable for breach of that contract. *Hansen I*, 49 Fed.Cl. at 177. This limited disposition complied with the Omnibus Case Management Order[6] instituted after the *Winstar IV* decision. *Id.* at 169. To establish both the existence of a contract and a breach, the *Hansen I* court relied on close parallels between our facts and those in *Winstar IV*. *Id.* at 177. On motions for partial summary judgment, the Court of Federal Claims ruled that a contract existed between the Hansens and Hansen Bancorp, on the one hand, and the United States, on the other hand. *Id.* at 174–75. The court also ruled that the enactment of FIRREA

and its implementing regulations breached that contract. *Id.* at 177–78. Accordingly, the court granted summary judgment of liability in favor of the Hansens and Hansen Bancorp. *Id.* at 178.

The parties then cross-moved for summary judgment on the issue of damages. *Hansen II*, 53 Fed. Cl. at 96. Relying on restitution and reliance damages theories, the Hansens sought to recover the $1 million they contributed to Hansen Savings under the Assistance Agreement, as well as the value of the Raritan stock they exchanged for shares of Hansen Savings stock pursuant to the Stock Exchange Agreement. For its part, the government moved for summary judgment barring any restitution. In the alternative, it urged that if any restitution was awarded, it be offset by a $1.2 million stock dividend paid by Hansen Savings to the Hansens after the merger.

The Court of Federal Claims refused to decide the issue of reliance damages on summary judgment because it determined that there were genuine issues of material fact surrounding the causation component of such damages. On the other hand, because causation is not an element of restitution, the court determined that the Hansens' claims for those damages were amenable to summary judgment resolution.

As discussed below, the remedy of restitution is available only if the breaching party's conduct amounts to a *total* breach of its contractual duties. In *Hansen II*, the Court of Federal Claims did not discuss or refer to the particular facts of the Hansen Savings transaction. Rather, it

---

**6.** Following the Supreme Court's decision in *Winstar IV*, the Chief Judge of the Court of Federal Claims implemented an Omnibus Case Management Order that provided a pro-

cedural framework for the over one hundred *Winstar*-related cases that remained pending before the court.

relied on the general implications of *Winstar* to assess the materiality of the government's breach:

> Although this court heretofore has not been called upon to characterize the Government's breach, it nevertheless has found that the supervisory goodwill promise was "essential" to that agreement. Similarly, although the Supreme Court in *Winstar* did not have occasion to characterize the breach according to any particular damages theory, it also held that the goodwill treatment was "essential to supervisory merger transactions of the type at issue in [that] case"....
>
> *Winstar* held that the repudiation of the supervisory goodwill promise breached an express agreement to allow such goodwill, or, at least, to carry the risk of loss with respect to the plaintiffs' goodwill accounting treatment. The result of the Government's repudiation of goodwill accounting treatment was substantial and devastating, characterized by the Court as "swift and severe." Indeed, the Court observed that Congress's express intent in passing FIRREA was to "abrogate" or "renege" on the contracts entered into by FSLIC. FIRREA "had the substantial effect of releasing the Government from its own contractual obligations." The Federal Circuit also has described the contractual obligation of goodwill accounting treatment as one of "substantial value" for plaintiffs. Although eschewing the term "total" or "substantial" breach, the Supreme Court and Federal Circuit in *Winstar* effectively ruled that the Government abrogated its responsibility to allow supervisory goodwill, that this abrogation made it impossible for the Government to perform its duty under the contract, and that the Government thereby breached "essential" or "critical" provision[s] of the assistance agreements. *The court therefore concludes that the Government's conduct in this case constituted a total breach of the Assistance Agreement.*

*Id.* at 103–04 (citations omitted) (emphasis added).

Having determined that there had been a total breach of contract, the Court of Federal Claims proceeded to consider whether principles of restitution permitted recovery for the Hansens. Under *Landmark*, the court noted, entitlement to restitution turns on the express content of the parties' written agreement. *Id.* at 104 (citing *Landmark*, 256 F.3d at 1372–73). In *Landmark*, we held that restitution is proper only where the contribution that the non-breaching party is seeking to recover was made in exact conformity with the literal terms of the contract; recovery may not be had where the plaintiff acted voluntarily, even if the action was taken with the intent to effectuate the spirit of the agreement. *Landmark*, 256 F.3d at 1375.

Because the Hansens' $1 million dollar capital contribution was explicitly required by section 2(b)(5) of the Assistance Agreement,[7] the Court of Federal Claims granted summary judgment awarding restitution in that amount to the Hansens. The court rejected the government's argument that the $1.2 million dollar dividend received by the Hansens approximately one

---

7. Section 2(b)(5) of the Assistance Agreement stated, "The INVESTORS shall contribute directly or through [Hansen Bancorp] one million dollars ($1,000,000) to the ACQUIRING ASSOCIATION."

year after the merger should be offset against the restitution award. Relying on *Landmark*, the court stated that an offset was not proper, "regardless of what defendant proved at trial, [as] the 'government's actions were simply not relevant to the dividends.'"[8] *Hansen II*, 53 Fed. Cl. at 108 (quoting *Landmark*, 256 F.3d at 1373–74). Thus, the court concluded that the Hansens were entitled to recover the full $1 million.

The Court of Federal Claims ruled against the Hansens, however, on their claim for restitution of the value of the Raritan stock they exchanged for shares of Hansen Savings stock pursuant to the Stock Exchange Agreement. In the court's view, recovery based on the Raritan stock transfer depended on "whether, as a matter of law, FHLBB's requirement that plaintiffs exchange their stock in Raritan constitutes a contribution of that stock under the Assistance Agreement." *Id.* at 106. The court held that it did not. The court stated that it had "no basis to find that the exchange of stock was a transaction that caused either a loss to plaintiffs or a benefit to defendant." *Id.* The court again reasoned from *Landmark*. Because plaintiffs were already subject to a "pre-existing duty" under New Jersey law that required the exchange of shares to complete a merger, the mere repetition of that requirement in the FHLBB Resolution did not elevate it to a contractual term compensable by restitution. *Id.* at 106–07. While the Hansens may have been acting in the "spirit of the agreement," they were not strictly "performing" a duty set forth in the Assistance Agreement. Therefore,

the court ruled the Hansens were not entitled to restitution of the value of their Raritan stock.

The court articulated several additional arguments against restitution, all supporting the conclusion that neither "a loss to plaintiffs [n]or a benefit to defendant," *id.* at 106, arose from the stock exchange. The court analogized to tax law, which provides that no gains or losses shall be recognized from an exchange of stock accomplished pursuant to a plan of corporate reorganization. The court also was persuaded by the continuity of the Hansens' ownership—they had owned all outstanding stock in Raritan prior to the merger and maintained that full ownership control in the new entity, Hansen Savings. The court interpreted the stock exchange requirement as a "transfer" that did not diminish the Hansens' ownership, rather than as a "contribution," which would have necessitated some surrender of the Hansens' controlling interest. This characterization affected the availability of recovery: "Any claim for the loss of Raritan's value thus is actually a claim for the loss of value of Hansen Bancorp's shares. Such a claim is not a claim for restitution, but a claim for loss of share value as the consequential damages of defendant's breach." *Id.*

Following the *Hansen II* decision, the plaintiffs withdrew all claims for reliance damages to expedite entry of a final judgment and this appeal. In due course, the court entered final judgment pursuant to its Rule 58, and this appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

**8.** The court explained its reasoning as follows: "The Government did not bestow upon plaintiffs $1.2 million, and the court cannot divine how the mere fact that the transaction subsequently enabled Hansen Savings to issue a dividend translates into the legal conclusion that the dividend was a benefit plaintiffs received from the Government under the contract." *Hansen II*, 53 Fed.Cl. at 108.

## ANALYSIS

### I.

We review a grant of summary judgment by the Court of Federal Claims *de novo* to determine whether the summary judgment standard has been correctly applied. Summary judgment can only be entered if there remains no genuine issue of material fact. Fed. Cl. R. 56(c); *Castle*, 301 F.3d at 1336. A court must draw all reasonable inferences in favor of the non-moving party and then determine whether the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On appeal, the Hansens argue that the Court of Federal Claims erred in rejecting their claim in restitution for the value of the Raritan stock they exchanged for Hansen Savings stock pursuant to the Stock Exchange Agreement. For its part, the government cross-appeals. In so doing, it challenges the Court of Federal Claims' ruling that there was a total breach, the predicate for an award of damages based on restitution. The government further argues, however, that assuming the Court of Federal Claims correctly decided that there was a total breach of contract, the court properly rejected the Hansens' claim for the value of the Raritan stock, but erred in ruling that the government was not entitled to have offset against the award of the Hansens' $1 million capital contribution the $1.2 million dividend the Hansens received from Hansen Savings. For the reasons that follow, we conclude that the Court of Federal Claims erred in ruling on summary judgment that the gov-

ernment's breach of contract was total. Accordingly, we vacate and remand.

### II.

 A review of the basic principles relating to remedies for breach of contract may be helpful to an understanding of the issues in this case. "When parties enter into a contract, and promise each other that they will perform in accordance with the terms of their agreement, they retain a choice: when the time comes they can perform, and accept whatever benefits and losses the contract gives them, or they can refuse to perform and pay the consequences." *Glendale*, 239 F.3d at 1379–80. In the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution. Restatement (Second) of Contracts § 344.[9]

 Compensation of a party's expectation interest "attempt[s] to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach." *Id.* § 344 cmt. a. This is commonly referred to as "giv[ing] the injured party the 'benefit of the bargain.'" *Id.* An award of lost profits is one way of compensating the promisee's, or the non-breaching party's, expectation interest. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir.2002) (citing *Glendale*, 239 F.3d at 1380).

 Reliance damages provide another way for a non-breaching party to recover losses suffered as the result of a breach of contract. Restatement (Second) of Con-

---

9. The Restatement of Contracts is recognized as an appropriate source of authority in contract cases. *Mobil Oil Exploration v. United* *States*, 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000).

tracts § 344(b). As reliance damages, the non-breaching party "may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 14.9 (4th ed.1998) (cited in *Glendale,* 239 F.3d at 1383).

▇▇▇ It is the third type of damages, restitution damages, which are at issue in this case. Restitution has been characterized as "a fall-back position" for the injured party who is unable to prove expectancy damages. *Glendale,* 239 F.3d at 1380. We explained in *Glendale* that "[t]he idea behind restitution is to restore—that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Id.* In other words, "[t]he objective is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." Restatement (Second) of Contracts § 384 cmt. a. Significantly, relief in restitution is "available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." *Id.* § 373.[10] A total breach is defined as one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.* § 243(4). Against this background, we turn to the government's cross-appeal. We address the cross-appeal first because it presents a challenge to the Court of Federal Claims' finding of total breach. It

was that finding that provided the predicate for the court's award of restitution damages. Absent a total breach, there can be no such damages.

## III.

As seen above, in holding that the government's conduct amounted to a total breach of contract, the Court of Federal Claims pointed to the decision of the Supreme Court in *Winstar IV,* as well as decisions of this court. Thus, it noted the Court's statement that goodwill treatment was "essential to supervisory merger transactions of the type at issue in [that] case." *Hansen II,* 53 Fed. Cl. at 103 (quoting *Winstar IV,* 518 U.S. at 849, 116 S.Ct. 2432). It also noted the Court's statement that FIRREA "had the substantial effect of releasing the Government from its own contractual obligations." *Id.* at 104 (quoting *Winstar IV,* 518 U.S. at 902, 116 S.Ct. 2432). After observing that in *Glendale* we described the contractual obligation of goodwill accounting treatment as one of "substantial value," *id.* (citing *Glendale,* 239 F.3d at 1381–82), the Court of Federal Claims reasoned that in *Winstar III* and *Winstar IV* both the Federal Circuit and the Supreme Court "effectively ruled that the Government abrogated its responsibility to allow supervisory goodwill" and that "this abrogation made it impossible for the Government to perform its duty under the contract." *Id.* The court therefore concluded that the government had committed a total breach of contract when FIRREA prevented Hansen Savings from amortizing the supervisory

---

10. The goal of restitution, to return the parties to their precise state before the contract, is incompatible with the situation of partial breach, where the non-breaching party has, to some extent, benefited from the transaction.

It is for this reason that section 384 of the Restatement makes recovery in restitution conditional on the return of any property that the parties have received pursuant to the agreement.

goodwill from the Raritan Hammonton transaction and from meeting its minimum capital requirements. *Id.*

### A.

In arguing that the Court of Federal Claims erred in ruling that there was a total breach in this case, the government asserts that the court failed to consider the facts and circumstances surrounding the contract and the breach of contract at issue. According to the government, the court mistakenly relied upon what the government characterizes as dicta from *Winstar IV* and neglected to account for what the government refers to as its "performance of many of its more substantial contractual obligations." The government also urges that the court failed to address the fact that the Hansens substantially altered the character of Hansen Savings after acquiring control.

The Hansens respond that the Court of Federal Claims did properly conclude that the enactment and implementation of FIRREA amounted to a total breach of contract. They first point to the Supreme Court's statement in *Winstar IV* that "[t]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." 518 U.S. at 848, 116 S.Ct. 2432. Next, the Hansens state that the contract at issue in this case contained "the same key provisions as the contract at

issue in *Winstar*." They assert that the government's obligations with respect to the treatment of supervisory goodwill were "essential" and that, but for those obligations, Hansen Savings would have been insolvent the moment it came into existence upon the merger of Raritan and Hammonton. According to the Hansens, the central issue is whether the enforcement of FIRREA's implementing regulations, which were contrary to the government's contractual obligations, particularly the obligation to allow supervisory goodwill, materially breached the contract. Whether or not the government fulfilled its other obligations under the contract and whether or not Hansen Savings would have failed anyway because of mismanagement, a matter relating to causation, are irrelevant considerations, say the Hansens.

We agree with the government that, insofar as the issue of total breach is concerned, the *Winstar* cases do not control this case. In *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) ("*Winstar I*"), the Court of Federal Claims found an implied-in-fact contract to exist between the plaintiffs and the United States, but ordered further briefing on various contract issues. In *Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1990) ("*Winstar II*"), the Court of Federal Claims granted the plaintiffs' motions for partial summary judgment on the issue of liability, concluding that the government had breached contractual obligations to permit the plaintiffs to count supervisory goodwill and capital credits [11] toward their regulatory capital requirements. *See Statesman Sav. Hold-*

---

11. Although it is not present in this case, the issue of "capital credits" does commonly arise in *Winstar* cases. In some cases, the FSLIC would contribute cash to a failing thrift, and the thrift would be allowed to credit the contribution to its net worth account. This meant that, for capital compli-

ance purposes, the FSLIC's contribution was to be treated as constituting a cash component of net worth rather than as an offsetting deduction to supervisory goodwill. FIRREA had the effect, in part, of preventing thrifts from counting capital credits toward regula-

*ing Corp. v. United States*, 26 Cl.Ct. 904 (1992) (granting summary judgment on liability to Glendale Federal Bank, FSB and The Statesman Group, Inc., two other acquirers of failed thrift institutions). In *Winstar III*, 64 F.3d 1531, this court, sitting *en banc*, affirmed the Court of Federal Claims' rulings on liability. We concluded that the FSLIC had made express contracts with the several plaintiffs, including a promise that supervisory goodwill and capital credits would be counted toward satisfaction of regulatory capital requirements. *Id.* at 1540, 1542–43. The Supreme Court granted certiorari and affirmed our *en banc* decision. *Winstar IV*, 518 U.S. at 859–60, 116 S.Ct. 2432.

The Supreme Court took *Winstar* "to consider the extent to which special rules, not generally applicable to private contracts," governed enforcement of the contracts at issue in the case. *Id.* at 860, 116 S.Ct. 2432. The Court stated that it was deciding whether the United States could assert "four special defenses" to the plaintiffs' claims for breach: the canon of construction that surrenders of sovereign authority must appear in unmistakable terms, *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); the rule that an agent's authority to make such surrenders must be delegated in express terms, *Home Telephone & Telegraph Co. v. Los Angeles*, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176 (1908); the doctrine that a government may not, in any event, contract to surrender certain reserved powers, *Stone v. Mississippi*, 101 U.S. (11 Otto) 814, 25 L.Ed. 1079 (1880); and the principle that a government's sovereign acts do not give rise to a claim for breach of contract, *Horowitz v. United*

*States*, 267 U.S. 458, 460, 45 S.Ct. 344, 69 L.Ed. 736 (1925). *Winstar IV*, 518 U.S. at 860, 116 S.Ct. 2432. The Court affirmed our *en banc* decision after rejecting each of these defenses. Significantly, the Court did not mention, let alone address, the question of whether the government's breach of contract was "total," so as to make the plaintiffs eligible for awards of restitution damages. Rather, the Court concluded, "Because the Court of Federal Claims has not yet determined *the appropriate measure or amount of damages in this case*, we remand for further proceedings." *Id.* at 910, 116 S.Ct. 2432 (emphasis added). Under these circumstances, the government is correct that the several statements from *Winstar IV* that were cited by the Court of Federal Claims in *Hansen II, see* 53 Fed.Cl. at 103–04, are not apposite. In short, while *Winstar* serves as the starting point in this case, it does not answer the question of whether the actions of the United States amounted to a total breach of contract, so as to entitle the Hansens to the remedy of restitution. It is to that question that we now turn.

### B.

We start from the premise that a "total breach" is a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." Restatement (Second) of Contracts § 243(4). For our purposes, the critical part of this formulation is the statement that the breach "substantially impairs the value of the contract to the injured party at the time of the breach." For all intents and

---

tory capital requirements. *See generally* *Winstar III*, 64 F.3d at 1535–39.

purposes, this is a way of saying that the breach "must be of a relatively high degree of importance." George E. Palmer, *The Law of Restitution* § 4.5 (1978). Section 241 of the Restatement lists five circumstances that are significant in determining whether a breach is material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

The comment to section 241 explains that the standard of materiality "is necessarily imprecise and flexible." Restatement (Second) of Contracts § 241 cmt. a. Thus, it is not to be expected that, in every case, each of the five listed circumstances will be pertinent. For example, it is difficult to see how circumstance (c) ("the extent to which the party failing to perform or to offer to perform will suffer forfeiture") could apply to the United States in this case. It is to be expected, however, that circumstance (a) ("the extent to which the injured party will be deprived of the benefit which he reasonably expected") will always be a pertinent consideration: "In deciding whether the breach is essen-

tial enough to justify restitution, a court should be concerned primarily with the objective of the plaintiff in seeking the performance promised by the defendant." Palmer, *The Law of Restitution* § 4.5; *see also Mobil Oil*, 530 U.S. at 621, 120 S.Ct. 2423 ("[U]nder the contracts, the incorporated procedures and standards amounted to a gateway to the companies' enjoyment of all other rights. To significantly narrow that gateway violated material conditions in the contracts. The breach was 'substantial,' depriving the companies of the benefit of their bargain. Restatement § 243."). With an eye to section 241, we have stated that the determination of whether a breach was material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1551 (Fed.Cir.1992).

As noted, the government argues that the Court of Federal Claims erred in its total breach analysis because it looked solely to *Winstar* and failed to consider the facts and circumstances surrounding the contract and the breach at issue, as required by law. The government emphasizes that if the Hansens received a "substantial part" of what they bargained for, the breach cannot be characterized as "total." As evidence that the Hansens enjoyed substantial benefits from the contract, the government points to the Hansens' operation of Hansen Savings from 1988 to 1992 without interruption. In addition, the government argues that, during that time, FSLIC contributions eliminated more than $85 million of Hammonton's $102 million deficit. The government also disputes whether enforcement of FIRREA's capital requirements was indeed inconsistent with the

original agreement. According to the government, under the agreement, it was entitled to enforce minimum capital requirements if capital losses occurred for reasons unrelated to Hansen Savings' acquisition of Hammonton. In sum, the government urges that, apart from FIRREA's termination of favorable accounting treatment for supervisory goodwill, it satisfied all its contractual obligations. That being the case, the government argues that the breach cannot be viewed as total.

The Hansens respond that the Court of Federal Claims' extensive analysis of *Winstar IV* supports its holding that there was a total breach in this case. The Hansens explain that the Court of Federal Claims was presented with, and indeed did consider, all of the arguments about materiality of breach that the government now raises on appeal. It would be speculation, say the Hansens, to presume that the court did not fully consider the government's position before rejecting it.

We cannot overlook, as the Hansens urge, the absence in the Court of Federal Claims' decision of consideration of the government's argument that the breach in this case was partial, rather than total. The degree to which the government fulfilled its obligations under the merger agreement remains sharply contested between the parties. The court acknowledged as much, stating that "to the extent that the financial position of the thrift is found to be relevant to plaintiffs' claims for restitution ... damages, summary judgment is inappropriate because virtually every fact involving causation is in dispute."

*Hansen II,* 53 Fed. Cl. at 97. The character of the government's breach, dispositive of the issue of restitution damages, requires further consideration and resolution of disputed factual issues.

We therefore hold that the Court of Federal Claims erred in ruling on summary judgment that the government's breach of contract was total, so as to make the Hansens eligible for an award of restitution damages. Accordingly, the judgment awarding the Hansens $1 million in restitution damages is vacated. The case is remanded to the court for further proceedings consistent with this opinion.[12]

## IV.

If a court determines that a breach of contract was total, the case proceeds to the next stage—where the injured party seeks to establish that the particular damages it is seeking qualify as proper restitution. *See Mobil Oil,* 530 U.S. at 621–24, 120 S.Ct. 2423. Thus, in this case, after finding that the government's breach of contract was total, the Court of Federal Claims addressed the Hansens' several claims for restitution. On appeal, both the Hansens and the government challenge certain of the court's rulings on the items of restitution that were sought. If, on remand, the Court of Federal Claims determines that the government's breach was not total, these challenges will become moot because the Hansens will not be entitled to any restitution. If, however, the court determines that the government's breach was total, it is reasonable to expect that the court will do one of two things: decide anew the question of what restitu-

---

12. We express no views as to whether there was a total breach of contract in this case. We simply hold that, to this point, the required analysis has not been conducted and

that, as far as that analysis is concerned, there appear to be genuine issues of material fact.

tion is appropriate, or simply enter the same judgment that it entered following its decision in *Hansen II.* Under these circumstances, although technically the proper measure of restitution damages is not before us, we believe that the interest of judicial economy makes it appropriate for us to state our views on this issue for the benefit of the parties and the trial court. *See Fla. E. Coast Ry. Co. v. United States,* 228 Ct.Cl. 647, 660 F.2d 474, 475 (1981) (Although the trial judge had ruled only on the issue of liability and the determination of quantum was reserved for further proceedings, the court addressed quantum because it thought it "appropriate ... to comment ... for the further guidance of the parties and the trial judge, and to underscore [its] judgment as to a controverted important issue central to the case."). We state our views in the context of the arguments already presented to us by the parties. First, however, we note certain principles applicable to restitution damages.

### A.

Section 373 of the Restatement provides in relevant part as follows:

(1) Subject to the rule stated in Subsection (2), on a breach by non-performance that gives rise to a claim for damages for total breach ... the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

(2) The injured party has no right to restitution if he has performed all of

his duties under the contract and no performance by the other party remains due other than payment of a definite sum of money for that performance.

■ Restatement (Second) of Contracts § 373. Thus, when faced with a claim for restitution following a total breach, a court must determine whether the claimant, or non-breaching party, conferred a benefit upon the breaching party. If a benefit was conferred, and the exception in subsection (2) of Section 373 does not apply, the court must determine the measure of restitution.

The Restatement further provides that "[i]f a sum of money is awarded to protect a party's restitution interest," it may be measured by either "(a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the other party's property has been increased in value or his other interests advanced." *Id.* § 371.

■ We have stated that restitution may be measured by either "the *value of the benefits* received by the defendant due to the plaintiff's performance" or "the *cost* of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract." [13] *Landmark,* 256 F.3d at 1372 (emphases added). The non-breaching party is not limited to

---

**13.** While these two approaches to restitution are not necessarily incompatible, we have observed that the "costs" measurement may sometimes be more properly viewed as a form of reliance damages. *See LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1376 (Fed.Cir.2003) (citing *Glendale,* 239

F.3d at 1379–80) ("When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract

recovering the particular value of its services to the defendant; rather, it may recover in restitution the reasonable market value of those services, measured at the time of performance. *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 530 (Ct.Cl.1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). However, the non-breaching party may be compensated only for the *net* loss that results from the defendant's breach. *See Landmark*, 256 F.3d at 1373 ("Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated."). Finally, if the value of the benefit conferred upon the breaching party is not ascertainable through some usable measure of damages, restitution may not be possible. *LaSalle*, 317 F.3d at 1376–77.

◼ Restitution may be inappropriate in two circumstances. The first is where relief would result in an "unfair windfall" to the non-breaching party. While an award of restitution should seek to return the non-breaching party to as good of a position as it would have been in if the contract had never been entered into, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir.2003). Courts should avoid bestowing an "unfair windfall" on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement. *See LaSalle*, 317 F.3d at 1371 (noting the "general principle that the

non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred").

◼ Finally, section 384 of the Restatement precludes restitution when the non-breaching party cannot return "any interest in property that he has received in exchange in substantially as good condition as when it was received by him . . . ." Thus, if the non-breaching party has used, destroyed or substantially altered in character property received from the breaching party so that return is not feasible, restitution is generally not available. Restatement (Second) of Contracts 384 cmt. a. We turn now to the question of restitution in this case.

### B.

◼ We turn first to the Court of Federal Claims' decision not to offset the Hansens' recovery of their $1 million capital contribution with the $1.2 million dividend they received from Hansen Savings. We see no error in this decision. The government correctly argues that, generally, any award of restitution to a plaintiff should be offset by the benefits he or she already has received from the defendant. *See id.* ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party."). However, this proposition does not come into play here. *Landmark* makes clear that offset is only proper where the benefits at issue were received directly from the breaching party. Here, the dividend was not received from the government, nor pursuant to any requirement of the

position by returning [to it] as damages the

costs incurred in reliance on the contract.").

contract. The dividend from Hansens Savings cannot be fairly attributed to the government; accordingly, it should not detract from any recovery by the Hansens of their capital contribution. *Landmark,* 256 F.3d at 1374 (stating that "because the government was not responsible for the dividends paid ... offset would not be proper").

### C.

 We turn next to the Hansens' claim for restitution of the value of the Raritan stock they exchanged for stock of Hansen Savings. As we explain, we think that if, on remand, the Court of Federal Claims determines that the government's breach of contract was total, it should allow the Hansens' claim for restitution of the value of the stock to go forward. We emphasize that, at this point, we believe only that the Hansens are not barred, as a matter of law, from advancing a restitution claim arising out of the exchange of their Raritan stock. We express no views as to the measurement or value of the claim, as that is an issue of fact properly reserved for determination by the trial court.

 We are concerned here with the non-breaching party's interest "in having restored to him any benefit that he has conferred on the other party" and also with the objective of avoiding the unjust enrichment of the breaching party. Restatement (Second) of Contracts §§ 344(c), 377 cmt. a. Section 371 of the Restatement provides guidance as to what may constitute a compensable benefit:

> *Measurement of Benefit* ... [A] party who is liable in restitution for a sum of money must pay an amount equal to the benefit that has been conferred upon him. If the benefit consists simply of a sum of money received by the party from whom restitution is sought, there is no difficulty in determining this amount. *If the benefit consists of something else, however, such as services or property, its measurement in terms of money may pose serious problems.*
>
> A particularly significant circumstance is whether the benefit has been conferred by way of performance or by reliance in some other way. Recovery is ordinarily more generous for a benefit that has been conferred by performance. To the extent that the benefit may reasonably be measured in different ways, *the choice is within the discretion of the court.* Thus, a court may take into account the value of opportunities for benefit *even if they have not been fully realized in the particular case.*

*Id.* § 371 cmt. a (emphases added). This comment suggests that "benefit" should be broadly construed to include money, services, and property of all types. *See also Farnsworth on Contracts* § 12.9 ("[T]he party in breach is required to account for a benefit that has been conferred by the injured party. Sometimes this is accomplished by requiring the party in breach to return the very benefit received and sometimes by requiring that party instead to pay a sum of money that represents the value of the benefit.").

 The availability of restitution insofar as the Raritan stock is concerned thus turns on whether the stock transfer is properly viewed as having conferred a "benefit" upon the government. We think that it did. Although the degree to which the Raritan Hammonton merger assisted the government (and correspondingly, the degree to which the Hansens should be compensated) will depend on further development of the facts, there is no doubt that the merger was desirable from the

FSLIC's point of view. By assuming the liabilities of Hammonton, the Hansens allowed the FSLIC to avoid the high cost of bailing out another insolvent thrift. At the same time, the investment of the Raritan shares into Hansen Savings was an essential component of the merger. In these respects, the stock exchange "advanced" the government's "interests." Restatement (Second) of Contracts § 371. We believe that, assuming for the moment a finding of total breach on remand, the fundamental requirements for restitution are present in the stock exchange: (1) the Raritan stock was contributed (2) in a way that benefited the government. That leaves for disposition on remand the question of whether the value to the government of the stock contribution has already been, in some manner, restored to the Hansens.[14]

▆ The Court of Federal Claims also decided against restitution on the ground

that state law already imposed a duty to exchange shares as part of the merger.[15] The argument is that by contributing their Raritan holdings, the Hansens were actually performing under New Jersey law a pre-existing legal duty, rather than a true "condition" of the Assistance Agreement. *Landmark* bars compensation for strategic business decisions not fairly attributable to the agreement with the government. *See* 256 F.3d at 1374–75. That was not the case here. The exchange of stock constituted the performance of a clear and explicit condition of the contract between the parties. The fact that it also happened to be required under New Jersey law does not negate the fact that the stock exchange was an explicit term of the Hansens' contract with the government.

Accordingly, in the event that on remand the Court of Federal Claims finds a total breach, it should allow the Hansens

---

14. The government advances several reasons as to why restitution in terms of the value of the Raritan stock would be inappropriate. First, it points to the Hansens' resulting ownership of the Hansen Savings stock, as well as the 60:1 share exchange rate, as evidence that the Hansens already have received compensation for their Raritan holdings. Although this argument is superficially appealing, we believe that it fundamentally mischaracterizes the transaction at issue.

While the conversion of the Raritan stock to shares of Hansen Savings did not require a surrender of ownership, it did require a surrender of control. The Hansens irrevocably contributed their Raritan assets to a risky venture based solely on the government's guarantees under the agreement. Were it not for the government's promises, Hansen Savings would have been insolvent from the start. As this court stated in *Glendale*, the government's assurance instigated the transaction: "[G]iven the choice between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with it, a reasonable banker would surely take the latter." 239 F.3d at 1382. The centrality of the government's

promise to the success of Hansen Savings suggests that the merger should be viewed as a ̄contribution of stock to a joint and risky venture, rather than as an exchange of shares between two entities owned by the Hansens.

Finally, stock is an asset with a monetary value, just like cash. If it is proper, as the Court of Federal Claims held and we agree, to reimburse the Hansens via restitution for their cash contribution, it would seem appropriate to do the same as far as the value of their stock is concerned. In short, we fail to see a compelling distinction between these two assets that would counsel us to allow restitution of the cash, but prohibit restitution of the stock.

15. Under New Jersey corporate law, shareholders of an acquiring company are required to exchange their shares for shares of the new, consolidated entity. *See* N.J. Stat. Ann. § 14A:10–3(6)(b). New Jersey requires shareholder approval for any such merger, *see id.* § 14A:10–3(2), and protects the right of a dissenting shareholder to cash out the value of his or her shares before such an exchange takes place. *Id.* § 14A:10–3(1)(b).

to proceed with their claim for the restitution of the value of the Raritan stock they exchanged for shares of Hansen Savings pursuant to the Stock Exchange Agreement.

### D.

 As a final point, we address the government's two additional arguments as to why restitution of either the $1 million cash contribution or the value of the Raritan stock is inappropriate in this case. Although the merit of the governments' allegations remains a factual matter to be resolved on remand by the Court of Federal Claims, we note here our views on how the court might frame its inquiry.

First, the government contends that restitution would result in an unfair windfall to the Hansens that would compensate them beyond the losses they actually sustained as a result of the breach. In making this argument, the government contends that "substantial benefits" accrued to the Hansens as a result of their control of Hansen Savings—in particular, a $1.2 million dividend and a $12.8 million dollar sale of a golf course to the bank.[16] These payments, the government urges, suggest that the Hansens have already redeemed their initial investment.

The government's argument casts the question as whether the Hansens ever benefited from the contract framed by the Assistance Agreement, the Forbearance Letter, and the other contract documents. The pivotal question, instead, is whether

an award of restitution would place the Hansens in an overall better position than if the breach of contract had not occurred. In that regard, it is to be recalled that the Hansens were required to contribute $1 million to Hansen Savings and to exchange all of their Raritan stock for stock of Hansen Savings. Subsequently, FIRREA prohibited the use of supervisory goodwill in meeting minimum capital requirements, rendering Hansen Savings insolvent. Further analysis is likely required to assess whether an award of restitution damages, on these facts, bestows an "unfair windfall" to the Hansens. We leave to the Court of Federal Claims the question of whether this case is one in which restitution would allow the non-breaching party to achieve, through the award of damages, "a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle*, 317 F.3d at 1371; *see also Bluebonnet Sav. Bank*, 339 F.3d at 1345.

 Second, the government asserts that, by shifting Hansen Savings' business to a more high-risk loan portfolio, the Hansens "substantially altered" the character of the bank, thus making it impossible to determine the net loss to the Hansens arising from the government's breach of contract, as required by section 384 of the Restatement [17] and by *Landmark*. We agree that the commingling of assets as a result of the Raritan–Hammonton merger and the subsequent activities of Hansen Savings may make it difficult to "unwind" the transaction between the Hansens and

---

16. In June of 1989, the Hansens sold an undeveloped golf course, Oak Terrace Country Club, to Hansen Savings for $12.8 million. The impetus for this sale, as well as the financial wisdom of the transaction for either party, remains disputed.

17. As noted, section 384 precludes restitution when the non-breaching party cannot return "any interest in property that he has received in exchange in substantially as good condition as when it was received by him . . . ."

the government for purposes of determining the appropriate amount, if any, that can be restored through restitution. We do not agree with the government, however, that this difficulty, on its own, prevents the Hansens from recovering any restitution. It is the inherent nature of the merger transaction, more than any alleged mismanagement after the merger, that makes it impossible for the Hansens to return "any interest in property that [they] ha[ve] received in exchange in substantially as good condition as when it was received by [them]. . . ." Restatement (Second) of Contracts § 384. If mismanagement on their part is established, the Hansens may be accountable for any diminishment of the character or value of property that can be directly traced to their mismanagement. However, we do not think that the Hansens' restitution claim may not proceed based solely on the consequences of the merger transaction.

## CONCLUSION

For the reasons set forth above, we hold that the Court of Federal Claims erred in ruling on summary judgment that the government's breach of contract was total so as to entitle the Hansens to an award of restitution damages in the amount of $1 million. Accordingly, the judgment in favor of the Hansens is vacated. The case is remanded to the Court of Federal Claims. On remand, the court will conduct further proceedings to determine whether the breach of contract in this case was total. If the court determines that the breach was total, it will conduct proceedings on damages consistent with this opinion.

*VACATED AND REMANDED.*