# United States Court of Appeals for the Federal Circuit

05-5150, -5152, -5159

AMERICAN CAPITAL CORPORATION
and TRANSCAPITAL FINANCIAL CORPORATION,

Plaintiffs-Cross Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Michael W. Kirk, Cooper & Kirk, PLLC, of Washington, DC, argued for plaintiffs-cross appellants American Capital Corporation and Transcapital Financial Corporation. With him on the brief were Charles J. Cooper, Vincent J. Colatriano and Nicholas A. Oldham.

Ashley Doherty, Federal Deposit Insurance Corporation, Legal Division, of Washington, DC, argued for plaintiff-cross appellant Federal Deposit Insurance Corporation. With her on the brief were Andrew C. Gilbert, John M. Dorsey, III., John V. Thomas, and Ellis Merritt, Jr., of Dallas, Texas.

William F. Ryan, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director. Of counsel on the brief were Jeanne E. Davidson, Deputy Director, and James R. Whitman, Trial Attorney.

Appealed from: United States Court of Federal Claims

Judge Susan G. Braden

# United States Court of Appeals for the Federal Circuit

05-5150, -5152, -5159

AMERICAN CAPITAL CORPORATION
and TRANSCAPITAL FINANCIAL CORPORATION,

Plaintiffs-Cross Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: October 30, 2006

_____

Before RADER, GAJARSA, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA. Opinion dissenting-in-part filed by Circuit Judge RADER.

This is a Winstar-related case. The United States, defendant-appellant, appeals from the final judgment of the Court of Federal Claims ("CFC") finding the United States liable for $109.309 million. American Capital Corporation ("ACC") and TransCapital Financial Corporation ("TFC"), plaintiffs-cross appellants, filed suit against the United States in 1995 asserting claims for breach of contract and takings contending that enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989

("FIRREA")—which phased out the ability of thrifts to count supervisory goodwill toward regulatory capital requirements—breached a contract that allowed TFC's subsidiary, Transohio Savings Bank ("Transohio"), to amortize such goodwill. On March 25, 1997, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as manager of the Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Fund and successor to Transohio, filed a complaint to intervene.

The trial court granted ACC and TFC's motion for summary judgment holding that the government was liable for a breach of contract. Am. Capital Corp. v. United States, 58 Fed. Cl. 398, 406-09 (2003) ("American Capital I"). Proceeding to damages, the court held on motion for summary judgment that the breach automatically entitled TFC to $168.7 million in reliance damages based on (1) the $126.479 million book value of Transohio and (2) an additional $42.166 million that TFC infused into Transohio.[1] Am. Capital Corp. v. United States, 59 Fed. Cl. 563, 580-84 (2004) ("American Capital II"). The court further held that the United States was entitled to summary judgment on the Plaintiffs' restitution claims, id. at 585-87; and the court subsequently dismissed the FDIC for lack of standing. Am. Capital Corp. v. United States, 60 Fed. Cl. 294, 295-96 (2004) ("American Capital III").

The court then conducted an evidentiary hearing to determine whether the preliminary award of $168.7 million should be reduced by any losses the government could demonstrate "would have been incurred [by TFC] irrespective of the breach." Am. Capital Corp. v. United States, 66 Fed. Cl. 315, 316 (2005) ("American Capital IV").

---

[1] For simplicity we abbreviate these figures to $126.5 million and $42.2 million, respectively.

05-5150, -5152, -5159                    2

After that hearing, the court reduced the preliminary award by $59.36 million and issued a final opinion. Id. at 364-92.

## I.  BACKGROUND

A.     <u>The Parties and Disputed Transactions</u>

Transohio is a wholly-owned subsidiary of TFC.  In the 1980s, Transohio was the largest savings and loan institution in Ohio primarily concerned with taking in deposits from customers and lending in the local area.  In 1984, ACC acquired a majority interest in TFC and adopted a very aggressive growth strategy.

In 1986, the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency of the United States, was searching for a firm to acquire two failing institutions, Citizens Federal Savings and Loan Association of Cleveland ("Citizens") and Dollar Savings Bank of Columbus ("Dollar").  TFC offered and won a bid to cause Transohio to merge with Citizens and Dollar.  In August of 1986, ACC, TFC, and Transohio entered into an Assistance Agreement with FSLIC, whereby FSLIC (1) made an immediate cash contribution of $107.5 million to Transohio, (2) agreed to purchase certain troubled assets of Citizen and Dollar for $42.5 million, and (3) agreed to indemnify ACC, TFC, and Transohio for expenses they might incur.  Along with its assistance, FSLIC further agreed that $50 million in supervisory goodwill arising from the transaction would count as regulatory capital subject only to a 25-year straight-line amortization schedule.[2]

---

[2]     We have explained this arrangement in similar cases as follows,

During the 1980s, the FSLIC encouraged private investors . . . to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors. The primary inducement that the FSLIC offered potential purchasers was a partial

Without the regulatory capital promised, Transohio would have been out of capital compliance and subject to immediate seizure as a result of its acquisition of the two insolvent thrifts. For their part, ACC and TFC agreed (1) to maintain Transohio's net worth at specified levels for five years, (2) to not cause Transohio to declare a dividend of more than 50 percent of its net income without regulatory approval, and (3) to observe certain restrictions regarding composition of Transohio's board of directors and loans to officers and directors.

Transohio initially recorded approximately $56.3 million of goodwill arising from the mergers under Generally Accepted Accounting Principles and an additional $107.5 million for goodwill related to the FSLIC assistance. Four months after the merger, TFC infused approximately $42.2 million into Transohio.

B.    FIRREA and the Government's Breach

In August of 1989, the Government enacted FIRREA, which restricted Transohio's ability to count supervisory goodwill and capital credit toward compliance

---

forebearance from regulatory capital requirements. The FSLIC accomplished this by allowing the purchaser to treat the thrift's asset shortfall itself as a fictional asset, so that the thrift's assets and liabilities were placed in equipoise at the time of acquisition—at least on paper. For instance, if a thrift had $ 80 in assets and $ 100 in liabilities, the FSLIC would allow the thrift's purchaser to allocate the $ 20 shortfall in real assets to a fictional asset called "supervisory goodwill." The FSLIC would then allow the thrift to include this supervisory goodwill among the assets used to meet regulatory capital maintenance requirements. Because the regulatory goodwill was amortized over a long period, . . . the thrift's purchaser would have to contribute much less in actual capital to the thrift. This made the thrift far more attractive to potential purchasers, at no cost to the FSLIC.

Landmark Land Co. v. FDIC, 256 F.3d 1365, 1370 (Fed. Cir. 2001).

with its tangible capital requirement.  As the Supreme Court noted in <u>United States v. Winstar Corp.</u>, 518 U.S. 839, 857 (1996), "[t]he impact of FIRREA's new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe."  Many institutions fell out of compliance and were either seized by government regulators or stayed in business only after "massive private recapitalization."  <u>Id.</u> at 857-58.  In this case, FIRREA deprived Transohio of 50% of its regulatory capital—almost $140 million.  Due to the change, Transohio had to shrink its asset base in order to improve regulatory capital ratios, and sell many of its more lucrative assets.

FIRREA's enactment caused a "snowball effect" that eventually resulted in the FDIC's seizure of Transohio.  The divestiture of assets together with the adverse publicity caused by the breach-induced loss of capital led to higher cost of funds that added to Tranohio's burden.  Furthermore, Transohio's remaining assets suffered from credit losses, due to the shrinkage in 1989.  Next, regulators imposed more stringent requirements on Transohio due to its weakened state, forcing even more losses.  In 1991, the government compounded the effects by imposing Individual Minimum Capital Requirements ("IMCR") requiring Transohio to increase tangible capital in less than 90 days and did not allow Transohio to use supervisory goodwill or capital credit toward that compliance.  In July of 1992, Transohio was placed into receivership.

C.    The CFC's Determination

The CFC found the United States liable for $109.309 million in damages to TFC due to the breach.  The court held as a matter of law that the government was liable for breach of contract and that TFC "incurred a loss of reliance interests as a direct result of

the government's breach in the amount of $168.645 million." American Capital IV, 66 Fed. Cl. at 316. The court, however, held an evidentiary hearing to afford the government an opportunity to establish with "reasonable certainty" the "losses that would have been incurred irrespective of the breach." Id.

After hearing the evidence the court decided to reduce the award to $109.309 million because TFC would have incurred losses irrespective of the breach. According to the CFC, approximately $50.3 million in losses would have been sustained from 1989 until 1991 because of (1) losses due to an aborted attempt to acquire AmeriFirst Bank; (2) losses associated with a mortgage business; (3) valuation adjustments on high-yield corporate bonds; (4) and misconduct of Transohio officers who managed a real estate portfolio. Id. at 377-90. Moreover, the CFC found that Transohio's value should be offset by the $9 million in dividends Transohio paid to TFC. Id. at 339-40. In sum, the CFC reduced the damages award by approximately $59.3 million.

The United States filed a timely appeal in this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Standard of Review

We review the grant of summary judgment and conclusions of law de novo. Anderson v. United States, 344 F.3d 1343, 1349 (Fed. Cir. 2003). Findings of fact are reviewed under a clearly erroneous standard. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001). Identification of the performance required by a contract is an issue of contract interpretation that is reviewed de novo. Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071-72 (Fed. Cir. 2003). A party's standing must exist

at all stages of judicial proceedings and may be reviewed at this stage de novo. <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477-78 (1990).

B.    <u>TFC's Recovery of Transohio's Value</u>

First, the United States contends that the CFC improperly held that TFC was entitled to recover the equity value of Transohio. The CFC held that even though the Assistance Agreement never mentioned an equity contribution by TFC, the agreement was subject to conditions previously discussed, namely the merger of Transohio with Dollar and Citizen. <u>American Capital II</u>, 59 Fed. Cl. at 581. The court found that TFC "put on the table" Transohio's ongoing business with equity valued at $126.479 million, which was the contract price for the benefits in the Assistance Agreement. <u>Id.</u> at 581. The government presents a two-pronged argument: (1) that the Assistance Agreement never requires Transohio's equity to be contributed and (2) that Transohio, even though wholly owned, was a separate corporate entity that owned its own equity (TFC was merely a shareholder). We agree with the government's arguments and therefore reverse the CFC's decision.

First, the Assistance Agreement does not require TFC to contribute its shares of Transohio to the merger. We must give clear and unambiguous terms of a contract their plain and ordinary meaning. <u>See</u> <u>Landmark</u>, 256 F.3d at 1373. We cannot rewrite a contract or insert words to which a party has never agreed. <u>See</u> <u>Coast Fed. Bank v. United States</u>, 323 F.3d 1035, 1039 (Fed. Cir. 2003) (en banc). Though TFC and ACC signed the Assistance Agreement, at most that agreement makes it a condition of FSLIC's assistance that the Transohio merger was "duly authorized by TFC, <u>as the sole shareholder</u> of TRANSOHIO." (emphasis added). ACC and TFC's other obligations

through the Assistance Agreement and other written commitments only amount to agreements to maintain the capital of Transohio or restrict the officers and directors of Transohio. There are no provisions requiring TFC to contribute its stock. Thus, the award of Transohio's equity value to TFC was improper under the terms of the contract itself.

Second, the CFC's holding runs afoul of the corporate form. We have "regularly acknowledged the legal distinction between a corporation and its shareholders and rejected claims by shareholders to assert a breach of contract claim on behalf of the corporation." So. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1332 (Fed. Cir. 2005) (citing First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999) (holding that a shareholder lacks privity of contract to sue the government for Winstar damages when only the corporation entered into an agreement with the FDIC); FDIC v. United States, 342 F.3d 1313, 1318 (Fed. Cir. 2003) ("Karnes") (same); Cain v. United States, 350 F.3d 1309, 1317 (Fed. Cir. 2003) (stating that the holding that there was no contract between the government and the shareholders of a thrift was consistent with this court's prior cases addressing the issue); Castle v. United States, 301 F.3d 1328, 1339 (Fed. Cir. 2002) (dismissing shareholders' claims on the grounds that they had not established that the government had entered into a contract with them as individuals independent of their status as shareholders)). As the Supreme Court has explained,

> A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. See, e.g., First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 625, 103 S. Ct. 2591, 77 L. Ed. 2d 46 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation'"); Burnet v. Clark, 287 U.S. 410, 415, 53 S. Ct. 207, 77 L. Ed. 397 (1932) ("A corporation and

05-5150, -5152, -5159                8

> its stockholders are generally to be treated as separate entities"). An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest. See 1 Fletcher, Cyclopedia of the Law of Private Corporations § 31 (rev. ed. 1999). A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary.

Dole Food Co. v. Patrickson, 538 U.S. 468, 474-75 (2003). A shareholder's participation in contract negotiations or funding of a particular transaction does not alter its intentional adoption of the corporate form to limit its own liability. So. Cal., 422 F.3d at 1332. To allow a shareholder to recover the same breach of contract damages both individually and through the corporation would result in an impermissible double recovery. Id. at 1332-33.

In certain circumstances we have allowed a shareholder to recover under a breach of contract theory, see, e.g., Hansen Bancorp, Inc. v. United States, 367 F.3d 1297 (Fed. Cir. 2004); however, recovery is only permitted when the shareholder has "a direct, personal interest in a cause of action," Franchise Tax Bd. of Cal. v. Alcan Aluminium, Ltd., 493 U.S. 331, 336 (1990). In Hansen, the Hansens, private individuals, agreed to merge their healthy bank, Raritan, with a failing thrift, Hammonton, into a new intermediate company, Hansen Bancorp, in which they would own all the shares. 367 F.3d at 1303. Under the agreement, the Hansens were required to commit both cash and stock to the merger. Id. at 1303-04. Because the contract required the Hansens to personally contribute their stock in return for the new corporation in reliance on the government's promise, we held that the "Hansens irrevocably contributed their Raritan assets to a risky venture based solely on the

government's guarantees under the agreement," and were entitled to restitution of the investment. Id. at 1317 n.14. We further noted that in that situation the Hansen's contribution of stock to the venture was the equivalent of a cash contribution, and therefore, they could recover said contribution. Id.

Here, as in So. Cal., TFC does not have such a direct interest. Though Transohio is a wholly-owned subsidiary of TFC and TFC made certain promises to maintain Transohio's capital, TFC's rights to claim Transohio's equity losses resulting from the government's breach were purely as a shareholder of Transohio. This conclusion is supported by the Assistance Agreement itself, which conditions the agreement on TFC's authorization of the merger "as the sole shareholder." Unlike Hansen, TFC did not contribute the shares of Transohio in reliance on the government's promises. Instead, Transohio, as its own separate entity, chose to merge with Citizens and Dollar.

TFC cannot randomly disregard the corporate form to its own benefit. Transohio's injuries that resulted in its losses and ultimate downfall are properly its own, and therefore its potential breach of contract claims against the government for those injuries must be brought in its name.[3] Accordingly, we reverse the CFC's holding that ACC and TFC could recover the $126.5 million book value equity of Transohio.

## C.    The $42.2 million Capital Infusion

Next, the United States maintains that TFC did not rely on the government's promises before infusing $42.2 million into Transohio. The government argues that it

---

[3]    Under Ohio law, TFC may raise a derivative shareholder claim; however, such a claim has not been made and even so would be an action to enforce the rights of Transohio, not TFC's rights. See Ohio Civ. R. 23.1.

created a genuine issue of material fact that TFC's capital infusion was contemplated before the merger took place and therefore could not have been made in reliance on the government's promises. TFC maintains that even if there is evidence before the merger suggesting that it planned to infuse capital into Transohio, it would never have infused the cash in a post-merger Transohio if it were not for the fact that the government promised favorable accounting and regulatory benefits that allowed Transohio to remain solvent after it merged with Citizen and Dollar. Thus, TFC contends that in relying on the government's promise it invested money to support the resulting company and lost those funds as a result of the government's breach. Here, we agree with the CFC and affirm the court's award of $42.2 million in reliance damages for the capital infusion.

Reliance damages are used "to put the non-breaching party in 'as good a position as [it] would have been in had the contract not been made.'" Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1364 (Fed. Cir. 2005) (citing Restatement (Second) of Contracts § 344(b) ("Restatement")). More specifically, "the injured party has a right to damages . . . , including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement § 349; accord Westfed, 407 F.3d at 1369-70.

In order to recover reliance damages, the "plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." Landmark, 256 F.3d at 1378. A loss may be foreseeable and therefore recoverable "'as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of

events, that the party in breach had reason to know.'" Id. (citing Restatement § 351(2)). See also 11 Arthur L. Corbin, Corbin on Contracts § 57.7 (rev. ed. 2005) (noting that net losses from collateral transactions "may be included in the damages awarded, if at the time the contract was made the breaching party had reason to foresee that such expenditures would be made and that the breach would prevent their reimbursement").

Here, the $42.2 million was a collateral transaction[4] that even though not explicitly contemplated by the agreement was at least foreseeable by the government. At the time of contracting, there was evidence that ACC and TFC planned to infuse approximately $40 million in capital into Transohio. TFC presented evidence that it would never have made the infusion into a post-merger Transohio without relying on the government's promise. Specifically, TFC presented the affidavit of its CEO and a government regulator indicating that TFC would not have moved forward with the infusion without some sort of reliance on the government's promise.

As the CFC notes, the cash infusion was made to aid implementation of the Assistance Agreement and to leverage Transohio's regulatory net worth after the merger. American Capital II, 59 Fed. Cl. at 583. In light of the record evidence, at the time of the merger the government was well aware of TFC's plan to infuse additional capital. As the government itself points out, there was evidence ACC and TFC were raising capital for Transohio even before the merger was complete.

---

[4]    The Restatement differentiates between "essential reliance," which is expenditures made in preparing for or actually performing the contract, and "incidental" or "collateral" reliance, which is expenditures in "preparation for collateral transactions that a party plans to carry out when the contract in question is performed." Restatement § 349 cmt. a.

05-5150, -5152, -5159                12

The government has presented no evidence to suggest that the infusion was unforeseeable. Instead, it simply contends that TFC's decision to infuse capital pre-merger would have remained unchanged post-merger even if Transohio did not have the benefit of the government's promises to allow more favorable accounting practices. Even the Supreme Court recognized that such logic would be "madness" without the government's promises because the existence of the resulting company would be in jeopardy from the signing of the contract. Winstar, 518 U.S. at 910. The fact that the infusion had been planned before the contract was made has little bearing on the ultimate damages. We must determine whether at the time of contracting the government could reasonably foresee that ACC and TFC would make the $42.2 million capital infusion in reliance on the government's promise and that the government's breach would prevent recovery of that investment. See Landmark, 256 F.3d at 1378. Thus, in a light most favorable to the government, the facts indicate that TFC made the capital infusion relying on the government's promises to give favorable accounting treatment and that the government had reason to know that TFC planned to make the contribution in reliance on the contract.

TFC is entitled to the $42.2 million it lost in reliance on the contract and the loss of which the government could reasonably foresee. It is possible that Transohio may have lost money and therefore TFC's may have lost its $42.2 million investment. However, due to the government's breach we cannot determine what those gains or losses may have been. Thus, the government is liable for the funding TFC provided in reliance on the contract in order to place TFC in as good a position as if the contract had not been made.

D.    Causation Burden of Proof

In a related argument, the government maintains that the CFC improperly relieved ACC and TFC of the burden to prove that the breach caused the damages. It contends that under the reliance theory of damages the plaintiff must prove that the breach caused TFC to lose its cash infusion before the burden shifts to allow the defendant to prove that the loss would have suffered had the contract been performed. However, the injured party has no such burden of proof when it simply claims reliance damages.

As we noted previously, reliance damages may be awarded to the injured party to the extent the breach resulted in a foreseeable loss. Id. As TFC has demonstrated the government had reason to know the loss would occur if it breached the contract, and the government's breach did, in fact, result in significant losses to Transohio from which it could not recover. By relying on the government's promises, TFC lost its cash infusion.

The government cites to many of our past Winstar cases that suggest a party's recovery of reliance damages is limited to "losses actually sustained as a result of the breach." See, e.g., Glendale Fed. Bank, 239 F.3d at 1382. However, these cases do not assign the burden of proof to the plaintiff to prove its expenditures in reliance on the contract would not have been lost in spite of the breach. Instead, by choosing to breach the contract, the government chose to shoulder the burden of proof under the reliance theory of damages. See Restatement § 352 cmt. a ("Doubts are generally resolved against the party in breach.").

But, TFC is not necessarily entitled to recover the entire cash infusion. Damages for the non-breaching party's reliance on a contract are recoverable less "'any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'" Westfed, 407 F.3d at 1369-70 (quoting Restatement § 349). Reliance damages allow the injured party to get back the expenditure it made in reliance on the contract. Essentially, the injured party may not be able to prove with reasonable certainty what it would have made if the contract was performed; however, it may be able to prove what expenditures it made in relying on the contract. Here, TFC demonstrated that its $42.2 million loss in reliance on the contract was foreseeable. At that point, we shift the burden to the breaching party and allow it to prove what expenditures would have been lost despite the breach. If the government can show with reasonable certainty that TFC would have lost the $42.2 million regardless of its breach, then TFC could not recover. See id.

While TFC is entitled to the $42.2 million in capital losses incurred by its infusion to Transohio, this amount should be offset by the capital gains TFC received from Transohio during this period. See Lasalle Talman Bank v. United States, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (recognizing that dividend payments are the capital returns for a cash infusion). In this case, the CFC found that Transohio issued a $9 million dividend to TFC in 1989. The CFC used this dividend to offset the book value of Transohio in its original award to TFC. Though the CFC's original offset calculations have now been mooted by the previous section because TFC's claims for Transohio's equity were improper as its shareholder, we hold that this dividend must offset TFC's infusion.

Here, the CFC's finding that the dividend was issued is supported by substantial evidence and the parties do not dispute this fact. Thus, TFC is entitled to its $42.166 million infusion less its $9 million extraction, resulting in a net award of $33.166 million to TFC.

E.    FDIC Claims

Finally, the FDIC appeals the CFC's dismissal of the FDIC's complaint for lack of standing. American Capital III, 60 Fed. Cl. at 295-96. The FDIC maintains that, as receiver for Transohio's failed estate, it retained the right to sue the government for breaching its obligations under the Assistance Agreement. The CFC found that Transohio lacked standing because it did not own its own stock and thus could not have contributed it to the mergers. We agree with the CFC and therefore affirm the CFC's decision to dismiss the FDIC for lack of standing.

F.    Restitution Damages

The TFC asserts that restitution damages are recoverable in this case. Restitution is an equitable remedy whereby the plaintiff can recover "'any benefit that he has conferred on' the repudiating party 'by way of part performance or reliance.'" Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604, 608 (2000) (citing Restatement § 373); see also Old Stone Corp. v. United States, 450 F.3d 1360, 1370-71 (Fed. Cir. 2006). However, restitution is not recoverable in addition to reliance damages for the same injury. See Petrofsky v. United States, 488 F.2d 1394, 1405 (Ct. Cl. 1973) ("[R]estitution and a suit for damages are alternative remedies."). Furthermore, an award of restitution cannot provide a windfall to the non-breaching party, see Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir. 2004);

Hansen Bancorp, 367 F.3d at 1318, and should be reduced by any losses not a result of the defendant's breach. See Hansen Bancorp, 367 F.3d at 1315 ("[T]he non-breaching party may be compensated only for the net loss that results from the defendant's breach.").

Here, the CFC held that restitution is unavailable in Winstar cases. See American Capital II, 59 Fed. Cl. at 586-87. While the court erred in that statement, see, e.g., Hansen Bancorp, 367 F.3d at 1316-17 (recognizing restitution as a possible remedy in Winstar cases), we see no reason why a party's claim for restitution in this case would be different than an alternate claim for reliance damages.

## III. CONCLUSION

In this case, the United States appeals the CFC's decision to award ACC and TFC $109.309 million in net losses from the government's breach in a Winstar-related transaction. For the reasons set forth herein, we (1) reverse the CFC award of Transohio's equity to TFC and ACC, (2) affirm the award of $42.166 million in reliance damages to ACC and TFC less the $9 million dividend Transohio issued to TFC, and (3) affirm the dismissal of the FDIC as a party. We remand for an award of damages to TFC consistent with this opinion.

AFFIRMED-IN-PART, REVERSED-IN-PART and REMANDED.

No costs.

# United States Court of Appeals for the Federal Circuit

05-5150,-5152,-5159

AMERICAN CAPITAL CORPORATION
and TRANSCAPITAL FINANCIAL CORPORATION,

Plaintiffs-Cross Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

RADER, Circuit Judge, dissenting-in-part.

This court holds today that the United States Court of Federal Claims (CFC) erred in determining that TransCapital Financial Corporation's (TFC's) cost of performance under the assistance agreement was the equity of Transohio, valued at $126.479 million. The trial court found that the essence of this Winstar contract was TFC's agreement, in exchange for the Government's regulatory capital contractual promises, "to allow Transohio Savings, in which [TFC] held stock valued at $126.479 million, to acquire two failed thrift institutions with a negative net worth of $130 million, which would have wiped out TFC's entire equity interest but for the benefits promised by the Government." Am. Capital Corp. v. United States, 66 Fed. Cl. 315, 355 (2005). Thus, the CFC determined that TFC offered an ongoing business valued at $126.479 million (almost the exact amount of the negative net worth of the failed thrifts) in

exchange for the Government's regulatory capital commitments. To my eye, the record more than amply supports the trial court on this point. Therefore, I would sustain the trial court's finding that TFC was entitled to recover the equity value of Transohio.

This court's majority reasons that nothing in the agreement required Transohio to merge or to contribute Transohio's value. However, the Assistance Agreement conditioned, as specifically noted by the trial court, the Government's contractual obligations on the receipt from TFC of "[m]ergers [that] have been duly authorized as the sole shareholder of Transohio." At the time of this transaction, TFC's primary asset was Transohio. Its net value of $126.470 million was at the time of the transaction almost identical to the negative net worth of the two failed thrifts at $130 million. TFC would not have authorized the merger but for the Government's promises. Thus, TFC should receive its reliance damages. Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001). Again, Transohio's obligations under the merger agreements were expressly conditioned on the execution of the Assistance Agreement. In turn, this agreement states that TFC must authorize the merger.

The Government argues, citing Old Stone v. United States, 405 F.3d 1360, 1371 (Fed. Cir. 2005), that only contributions of actual assets, such as "cash" or "stock" are recoverable initial contributions. The Government argues that in this case, neither TFC nor Transohio contributed stock, cash, or any other assets to the transaction. Thus, the Government argues, TFC's restitution/reliance claims, which are based upon alleged "initial contributions", should be rejected. The Government misreads this case. Nothing in Old Stone expressly limits the character of a recoverable initial contribution:

> We have suggested that restitution of initial contributions of both stock and cash in Winstar transactions may be allowable because both forms of

contribution confer a benefit on the government. In <u>Landmark</u>, we held that restitution of an initial cash contribution to a supervisory merger was appropriate when the contribution was expressly required by the assistance contract. In <u>Hansen</u> we indicated that it might be possible to consider a stock transaction as a "benefit conferred" in a Winstar case that would be subject to restrictions.

<u>Id.</u>

In <u>Westfed Holdings, Inc. v. United States</u>, 407 F.3d 1352, 1368 (Fed. Cir. 2005), this court affirmed an award of reliance damages measured by the amount the holding company paid to acquire a thrift that then merged with a failing thrift in reliance upon the Government's regulatory promises. Further, this court in <u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297, 1303 (Fed. Cir. 2004), granted reliance damages to the Hansens, who merged their bank and an insolvent thrift into a new thrift. This thrift was owned by an intermediary company which in turn was wholly owned by the Hansens. These cases amply support the trial court's decision in this case.

Thus, I would find that the trial court did not err in holding that TFC's cost of performance under the assistance agreement was the equity of Transohio.