# United States Court of Appeals for the Federal Circuit

---

**DAIRYLAND POWER COOPERATIVE,**
*Plaintiff-Cross Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5110, -5111

---

Appeal from the United States Court of Federal Claims in case no. 04-CV-106, Judge Edward J. Damich.

---

Decided: June 24, 2011

---

ROBERT L. SHAPIRO, Hughes Hubbard & Reed, LLP, of Washington, DC, argued for plaintiff-cross appellant.

HAROLD D. LESTER, JR., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, ALAN J. LO RE, Assistant Director, and SCOTT SLATER, Trial Attorney. Of counsel on the brief were PATRICK B. BRYAN, Trial Attorney, and JANE K. TAYLOR,

Office of General Counsel, United States Department of Energy, of Washington, DC.

––––––––––––––––––––

Before RADER, *Chief Judge*, GAJARSA and PROST, *Circuit Judges.*

PROST, *Circuit Judge.*

This case concerns the Department of Energy's ("DOE's" or "the government's") breach of its obligation to accept spent nuclear fuel from the nation's nuclear power utilities.  Liability is not at issue.  The parties dispute various aspects of the U.S. Court of Federal Claims' damages award.

First, the government contends that the trial court erred in awarding damages based on testimony that absent breach, the plaintiff would have successfully bargained its way to the front of DOE's fuel acceptance queue and would have transferred away all spent nuclear fuel in the first year of performance.  Relatedly, Dairyland cross-appeals the amount of damages award, contending that the trial court erred in reducing the damages awarded by the cost of purchasing the exchange.  Second, the government argues that the trial court erred in awarding the plaintiff damages to compensate for various indirect overhead costs it claims were caused by the breach.  Third, the government contests the trial court's award of plaintiff's investment in an industry consortium to build a private spent fuel storage facility, particularly because, the government points out, plaintiff received significant equity in the venture for its investment.  *See generally Dairyland Power Coop. v. United States*, 90 Fed. Cl. 615 (2009) ("*Trial Op.*").

We hold that the Court of Federal Claims did not commit reversible error in three of these four issues. We therefore affirm the award of damages based on plaintiff's "exchange" model and the award of indirect costs, as well as the cross-appealed discounting of plaintiff's damages. Regarding the plaintiff's investment in a private venture to build a spent fuel storage facility, we hold that the court was required to only award the cost of that investment to the extent it was made for mitigation, and not as a speculative venture for profit. We vacate the award of damages for the investment in the private fuel storage venture, and we remand for determination of the extent to which the investment was mitigation and the extent (if any) to which it was speculation.

## I. BACKGROUND

This appeal, like a number of others recently before or pending with this court, concerns the government's liability for damages in connection with its failure to develop a permanent solution for the storage of spent nuclear fuel ("SNF").[1] From 1967 to 1987, Plaintiff

---

[1] *See, e.g.*, *Dominion Res., Inc. v. United States*, Nos. 2009-5031, -5032, 2011 WL 1532145 (Fed. Cir. Apr. 25, 2011); *Energy Nw. v. United States*, No. 2010-5112, 2011 WL 1312306 (Fed. Cir. Apr. 7, 2011); *S. Nuclear Operating Co. v. United States*, No. 2008-5020, 2011 WL 832912 (Fed. Cir. Mar. 11, 2011); *Carolina Power & Light Co. v. United States*, 573 F.3d 1271 (Fed. Cir. 2009); *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282 (Fed. Cir. 2008); *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268 (Fed. Cir. 2008); *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005); *see also N. States Power Co. v. United States*, No. 2008-5037 (Fed. Cir. argued Apr. 4, 2011); *Pac. Gas & Elec. Co. v. United States*, No. 2010-5123 (Fed. Cir. argued Mar. 10, 2011); *S. Cal. Edison Co. v. United States*, No. 2010-5147 (Fed. Cir. argued Mar. 9, 2011); *Sys. Fuels v. United States*, No.

Dairyland Power Cooperative ("Dairyland") operated a nuclear power plant in Genoa, Wisconsin called the La Crosse Boiling Water Reactor. The reactor is no longer active, but Dairyland maintains 38 metric tons of spent uranium there in a wet storage pool. The fact that there is SNF stored on-site prevents Dairyland from permanently decommissioning the La Crosse plant.

In 1983 Dairyland, along with the nation's other operating nuclear utilities, entered into a contract with the Department of Energy ("DOE") to address the question of what to do with SNF. *See* Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 10 C.F.R. § 961.11 (1983) ("Standard Contract"). The Standard Contract obliged DOE to accept possession of and title to the signatory utilities' SNF no later than January 31, 1998. *Id.* art. II. DOE had a mandate from Congress to take responsibility for long-term storage of contract holders' SNF. *See generally* Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* (2006).

The Standard Contract provided that DOE would accept a certain amount of SNF from various utilities each year until all the SNF from all the signatory utilities had been removed. Standard Contract, art. II. While the contract did not set forth a detailed schedule for this removal, it stated generally that acceptance priority rankings would be assigned based on "the date of discharge of such material [e.g., SNF] from the civilian

2010-5116 (Fed. Cir. argued Feb. 8, 2011); *Vt. Yankee Nuclear Power v. United States*, No. 2011-5033 et al. (Fed. Cir. docketed Dec. 16, 2010); *Yankee Atomic Elec. Co. v. United States*, No. 2011-5020 et al. (Fed. Cir. docketed Nov. 9, 2010).

nuclear power reactor." *Id.*, sec. VI.B.1(a). This became known as the "oldest fuel first" priority ranking. The Standard Contract required DOE to issue an annual capacity report ("ACR") that would project in a more detailed fashion DOE's acceptance of SNF from the utilities. *Id.*, sec. IV.B.5(b).

The schedules on which DOE would accept spent fuel from the utilities were known as "delivery commitment schedules." *See* Standard Contract, sec. V.B. The Standard Contract permitted the utilities to negotiate with each other to adjust the delivery commitment schedules proposed by DOE:

> E. Exchanges
>
> Purchaser [i.e., the utility] shall have the right to determine which SNF and/or HLW [high-level radioactive waste] is delivered to DOE; *provided, however*, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however*, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. . . .

*Id.* sec. V.E.

DOE was unable to meet its contractual obligation to take possession of the utilities' SNF by January 31, 1998, and as a result, partially breached the Standard Contract. *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1284, 1287 (Fed. Cir. 2008). Due to DOE's breach, Dairyland has had to maintain the 38 metric tons of SNF in its

wet storage pool. Had DOE performed, the parties agree that, based on the ACR, the last of the SNF at the La Crosse plant would have been removed in late early 2006. *Trial Op.*, 90 Fed. Cl. at 615. The cost of maintaining the SNF, according to Dairyland's estimate, is about $29.8 million along with approximately $6.1 million in general overhead costs.

Dairyland also sought a solution for storing SNF off-site. It became associated with a venture to privately develop an SNF repository known as Private Fuel Storage, LLC ("PFS"). PFS was formed by a consortium of eleven nuclear utilities (Dairyland included) in order to locate, license, build, and operate such a facility. Dairyland decided to become a shareholder in PFS as a means of sharing with other nuclear operators the cost associated with such a project.

Dairyland structured its participation in PFS as follows. In 1995, it set up Genoa Fuel Tech, Inc. ("GFT") as a wholly-owned subsidiary incorporated in Wisconsin. This permitted Dairyland to avoid potential legal liability and unfavorable tax treatment associated with its investment in PFS. *See Trial Op.*, 90 Fed. Cl. at 647. Dairyland contributed about $8.7 million into GFT, which GFT then invested in PFS in exchange for shares. Dairyland also incurred about $2.3 million in various other costs to support GFT, most of which were administrative expenses. Dairyland also allocated about $1 million in general and administrative overhead costs to its involvement with GFT and PFS.

Dairyland sued for breach of contract in the Court of Federal Claims in January 2004. The court entered summary judgment of liability. *Dairyland Power Coop. v. United States*, No. 04-106C, Dkt. #35 (Fed. Cl. Apr. 27,

2006) (unreported) (citing *Energy Nw. v. United States*, 69 Fed. Cl. 500 (2006)). The case proceeded to damages.

Shortly before trial, the court denied the government's plea for summary judgment that Dairyland could not recover damages for its investment in PFS. *Dairyland Power Coop. v. United States*, 82 Fed. Cl. 379 (July 2, 2008) ("*SJ Denial*"). It held a bench trial, and awarded Dairyland about $37.6 million. *Trial Op.*, 90 Fed. Cl. at 618. The award included roughly $16.6 million for Dairyland's cost of maintaining SNF on-site from late 1998 to 2006 and roughly $12 million for its investment in PFS. About $6.1 million of the award was for various overhead costs associated with Dairyland's mitigation.[2]

Post-trial, the court denied a motion from Dairyland to reconsider the amount awarded for SNF maintenance costs (Dairyland had sought over $33 million). *Dairyland Power Coop. v. United States*, No. 04-106C, slip op., 2010 WL 637793 (Fed. Cl. Feb. 22, 2010) (unreported) ("*Denial of Reconsid.*"). The government timely appealed the award of SNF maintenance costs, costs of investment in PFS, and the award of overhead costs generally.

---

[2] The Court of Federal Claims' discussion of damages included a discussion of SNF maintenance costs, a discussion of PFS investment costs, and a discussion of overhead and general and administrative (G & A) costs. The sums awarded in the SNF maintenance and PFS investment categories each *included* recovery of overhead and G & A expenses, i.e., some of the $16.6 million awarded for SNF maintenance was for overhead and G & A costs, and likewise for the $12 million awarded for PFS investment. The cited $6.1 million figure for overhead and G & A costs is thus not a standalone award, but the sum of the overhead and G & A costs awarded in other categories. We perceive no double counting in the trial court's opinion.

Dairyland cross-appealed concerning the amount of its SNF maintenance award. We have jurisdiction over these appeals from a final judgment of the Court of Federal Claims under 28 U.S.C. § 1295(a)(3).

## II. Discussion

### A. Standard of Review

We review the judgments of the Court of Federal Claims to determine if they are incorrect as a matter of law or premised on clearly erroneous factual determinations. *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed. Cir. 1991). We review that court's legal determinations de novo. *Dehne v. United States*, 970 F.2d 890, 892 (Fed. Cir. 1992).

### B. The Court of Federal Claims Committed No Error in Adopting Dairyland's "Exchanges" Model

Several of the issues on appeal concern the trial court's award of damages for Dairyland's cost of SNF maintenance from the end of 1998 to the close of damages, December 31, 2006. *See Trial Op.*, 90 Fed. Cl. at 635.

As discussed, there is no dispute that, under the "oldest fuel first" rubric of the Standard Contract, Dairyland was not entitled to have the last of its fuel removed until 2006. Nevertheless, the Court of Federal Claims awarded damages for Dairyland's storage costs from 1999 to 2006 because it credited Dairyland's evidence that it would have participated in exchanges to eliminate all of its SNF in 1998. *Trial Op.*, 90 Fed. Cl. at 627–36. This had the effect of making all Dairyland's costs from that time to the end of the damages period recoverable.

The court's holding for Dairyland in this respect was largely based on Dairyland's argument that an "exchanges market" would have existed. Dairyland presented legal argument and fact and expert testimony that, had the government not breached, utilities who believed their delivery commitment schedules were unacceptably late would have negotiated with those who held year-one delivery commitments. This "exchanges market" did not actually emerge because the government breached, but Dairyland contended that it was a foreseeable aspect of the non-breach world, pointing particularly to the Standard Contract's "Exchanges" provision. Standard Contract, sec. V.E. Dairyland's expert modeled this market, and opined that Dairyland would have successfully bargained with the other utilities for year-one acceptance of all Dairyland's SNF, i.e., DOE would have removed 100% of Dairyland's 38 tons of SNF by the end of 1998. Dairyland's expert also testified that Dairyland, as a shutdown reactor with a small amount of SNF, "would have been willing to pay among the most for each ton of 1998 acceptance allocations." *Trial Op.*, 90 Fed. Cl. at 633. The trial court agreed, and so computed Dairyland's damages as covering the period from late 1998 to 2006.

On appeal, the government argues that the trial court's award was clearly erroneous. The government cites a number of alleged deficiencies. For example, the government complains that Dairyland did not identify the specific utilities it would have obtained year-one delivery commitment schedules from. The government also argues that local communities might have pressured utilities having year-one delivery commitment schedules to use those schedule slots themselves (and so remove waste from the area), and that Dairyland's proof fails to take this pressure into account. The government also contends

that Dairyland's proof ignores the possibility that utilities having year-one delivery commitment schedules might try to extract high prices for them. The government argues that the court's award fails to reflect such motivations by the "seller" utilities. And the government argues that Dairyland did not put forward sufficient evidence of any pre-litigation intent to press for early removal of SNF from the La Crosse plant. The government views these purported deficiencies as undermining Dairyland's case to the point that it was clear error for the Court of Federal Claims to credit Dairyland's evidence and argument, and to hold that SNF storage costs from late 1998 through the end of the damages period were recoverable.

This court reviews the factual findings of the Court of Federal Claims only for clear error. The trial court's opinion discusses in detail the evidence presented by Dairyland, as well as the government's arguments in opposition. The court viewed the government as essentially pointing out possible problems with Dairyland's proof, but without showing how those problems could be resolved or that they affected the outcome of the analysis. Rather than undermining Dairyland's case, the government's proffer was deemed "not particularly helpful to the Court." *Trial Op.*, 90 Fed. Cl. at 633. We find no error in this conclusion, as it appears to have been grounded in proper weighing of the evidence.

Concerning, for example, the government's complaint that Dairyland failed to identify specific utilities with whom it would contract for accelerated delivery commitment schedules, the court concluded that, even assuming some utilities refused to contract, "the Government did not make any showing that this would have substantially affected Mr. Graves's [Dairyland's

expert witness] conclusions." *Id.* at 634. The government has pointed to nothing in the record to reveal clear error in this conclusion.

Concerning the government's argument that Dairyland had not shown pre-litigation intent to exchange for earlier acceptance, the court noted that Dairyland and the DOE had taken some steps pre-breach in the direction of setting up a market for exchanges. *Id.* at 632. The court noted the government's complaint and stated that evidence of actual negotiation "would certainly have strengthened [Dairyland's] claim," but cited other evidence put forward by Dairyland as "convincing evidence of its preexisting interest in utilizing the exchanges process." *Id.* Again, the government's arguments on appeal do not demonstrate clear error in the trial court's reasoning.

As to the government's contention that local politics would have prevented utilities possessing year-one delivery commitment schedules from bargaining, after review of the record we find no basis for concluding that such considerations should have barred the trial court's findings. The government's main evidence for this contention, testimonial suggestions that local politics would have been a factor in non-breach-world negotiations over delivery commitment schedules, was before the court and, in our view, properly weighed. We therefore defer to the trial court in its determination that the evidence of Dairyland's ability to negotiate for year-one delivery commitment schedules was sufficient to prove the issue.

In a related vein, the government also contends that the model proposed by Dairyland was too speculative to be the basis of a damages award. The government points

particularly to Dairyland's claim that, once Dairyland had completed negotiations for year-one delivery commitment schedules for all its SNF, DOE would have approved the transaction. *See* Standard Contract, sec. V.E. Citing this court's precedent, the government contends that this is a step too far in the modeling of hypothetical behavior, and argues that there is no certainty at all as to whether DOE would or would not have approved the transaction. Appellant Br. 25 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1561–62 (Fed. Cir. 1997)). Certainly the Standard Contract reserves to DOE the right to disapprove any proposed exchange of delivery commitment schedules, "in its sole discretion." *Id.* The government further points out that some of the SNF at the La Crosse plant is "failed fuel," and argues that DOE might have been reticent to accelerate its removal.[3]

The question of whether Dairyland's model is or is not too speculative to be reliable is, again, a fact issue on which we owe deference to the Court of Federal Claims. That court's opinion demonstrates that it considered the government's arguments and found them unpersuasive. *Trial Op.*, 90 Fed. Cl. at 633. The evidence highlighted by the government on appeal does not demonstrate clear error. While considerations such as DOE's discretion to approve such transactions and worries about the presence of failed fuel are certainly relevant, they are not overriding concerns sufficient to make the court's finding clearly erroneous.

---

[3] Failed fuel' means spent nuclear fuel that, while otherwise meeting the Standard Contract's specifications, is contained in defective fuel assemblies (e.g. structural deformity, damage requiring special handling)." *Dairyland Power Coop. v. U.S.*, 79 Fed. Cl. 722, 727 n.5 (2007).

*San Carlos Irrigation* is consistent with our reasoning. There, as here, this court affirmed the trial judge's finding on whether certain claimed damages were too speculative to be awarded. In that case, the trial judge had denied a plaintiff's attempt to recover the value of water it would have received *if* the government had not breached *and if* there had been an excess of water in that year *and if* the government had elected to designate part of that excess "surplus" and convey it to the plaintiff. *San Carlos Irrigation*, 111 F.3d at 1561–62. This court affirmed (albeit on slightly different grounds than the trial court), and stated, "Too many contingencies—including, most importantly, the discretion of the agency to dispose of excess water—exist in the causal chain[.]" *Id.* at 1563.

As this court found no error in the denial of damages in *San Carlos Irrigation*, we find no error in the damages award here. If anything, *San Carlos Irrigation* reminds us that the question of whether the "causal chain" is sufficiently well-formed is one of fact, to be made in the first instance by the trial judge and reversed by this court only for clear error. As that circumstance is not presented here, we affirm the trial court's determination that Dairyland was entitled to damages for its storage of SNF for the entire period from 1999 to 2006.

## C. The Court of Federal Claims Committed No Error in Offsetting Dairyland's SNF Maintenance Award to Account for the Cost of Exchanges

We next turn to Dairyland's cross-appeal and examine the trial court's limitation of awarded damages. Dairyland asked the trial court to award it $33,282,048 to recover its SNF storage costs. Though adopting most of Dairyland's methodology for computing SNF storage

damages, the trial court disagreed that the full amount should be awarded. Instead, the court awarded Dairyland precisely half—$16,641,024. *Trial Op.*, 90 Fed. Cl. at 636.

The reason was that although Dairyland's damages proof relied on the premise that Dairyland would negotiate for year-one delivery commitments, the $33.3 million figure did not account for the cost of those commitments. *Id.* at 635–36. The court noted that acquiring year-one delivery commitments would confer great benefits to Dairyland. It reasoned that the sellers (utilities holding year-one delivery commitments) would know their value:

> The Court is convinced that all utilities would have assigned significant value to their allocations, and would have behaved as sophisticated and well-advised negotiators. Buyers would only have induced sellers to part with their allocations by offering to share the benefits of such a bargain. Thus, as Dr. Neuberger [the government's expert] testified, "you could have situations [resulting in] any price, up to and including the willingness to pay amounts." Both buyers and sellers would have come to the negotiating table demanding no less than a fair share of the benefits of the bargain.

*Id.* at 635 (second alteration in original) (citation omitted).

Dairyland argued that if the cost of these allocations were to be taken into account, it should be about $2 million. Citing trial testimony, the trial court rejected that figure as "requir[ing] substantial upward adjustment." *Id.* It reasoned that the buyer and the

seller of the year-one delivery commitment would split the benefits evenly, and the cost of the commitments would be exactly half their value to Dairyland. It wrote, "The Court will offset Dairyland's SAFSTOR [i.e., SNF maintenance] damages by that amount [i.e., half] and award Dairyland the other half, or $16,641,024." *Id.* at 636.

On appeal, Dairyland presents two arguments attacking this conclusion, one contending that there was legal error and one that there was factual error.

First, Dairyland argues for legal error because it views the cost of the first-year delivery commitments as a cost only deferred by the government's breach, and not avoided. Dairyland argues that, while a non-breaching party's recovery can in some cases be offset to account for costs it avoided because of the breach, it is inappropriate to offset for costs that are not avoided but only deferred. *See Carolina Power*, 573 F.3d at 1277. It argues that the government's breach merely deferred Dairyland's cost of accelerating acceptance, reasoning that when the government ultimately performs, Dairyland will have to negotiate again for year-one delivery commitments from the other utilities.

The trial court disagreed, and so do we. *See Denial of Reconsid.*, slip op. at 3. The cost of accelerating acceptance in 1998 is not one that will necessarily recur when and if the government eventually performs. The former is a past cost that, as has now been established, would have occurred in the absence of breach. The latter is an elective future cost that Dairyland might or might not take up, depending on its situation. The trial court did not find that Dairyland will in the future be saddled with this cost, and we see no error there. *"Carolina*

*Power* properly urges caution when speculating about the future in a case of partial breach—usually, the proper approach is to wait for those events to actually occur, and to resist premature conclusions." *Energy Nw.*, slip op. at 12 (citing *Carolina Power*, 573 F.3d at 1277). We therefore hold that there was no error of law in the trial court's treatment of Dairyland's damages request.

Dairyland next argues that there was an error of fact, and that the $16.6 million reduction in its award was excessive and based on a misinterpretation of the evidence. On factual questions, we defer to the trial court absent clear error. Dairyland points to its expert's testimonial opinion that the "exchanges market" was one with multiple sellers, which would essentially compete with one another to sell their allocations to Dairyland. Cross-Appellant Br. 43. It argues that this negotiation would bring the final price of year-one delivery commitment schedules to "something near the marginal bid price" which, in Dairyland's view, was dramatically lower than $16.6 million.

In a similar line, Dairyland argues that the court misinterpreted a statement by its expert that "the cost of exchanges could have ranged as high as $21.2 million." Cross-Appellant Br. 39. Dairyland argues that this testimony was limited to a damages analysis not applicable in this case.[4] Dairyland also complains that to the extent there was any uncertainty about the amount Dairyland would have had to pay to accelerate SNF

[4]   Dairyland's expert had apparently offered opinions concerning economic outcomes if the delivery commitment schedules of the 1991 Annual Capacity Report were used as a starting point, rather than the 1987 Annual Capacity Report that the trial court ultimately used. Cross-Appellant Br. 39.

acceptance, that uncertainty should be resolved against the government.

The trial court's order denying reconsideration addresses each of these arguments. *Denial of Reconsid.*, slip op. at 3–4. On review, we do not find clear error in the court's treatment of any of them. On the question of whether the presence of multiple sellers would drive down the price, the court noted that there were also multiple buyers, whose presence in the market Dairyland's expert had not sufficiently addressed. Concerning the testimony of Dairyland's expert, the court confirmed that its holding applied the appropriate ACR and gave proper weight to the expert's opinion. And the court rejected Dairyland's implication that the government had failed to carry any burden of proof properly assigned to it. In the court's view, the evidence "allowed it to fashion a fair damages award with 'reasonable certainty.'" *Id.* at 3. That award was the $16.6 million award now on appeal.

"This court affords the Court of Federal Claims wide discretion in assessing an appropriate quantum of damages." *Carolina Power*, 573 F.3d at 1276. As the primary finder of fact, part of the trial court's role is to fashion a fair assignment of responsibility—even where, as here, the solution departs from the specific relief requested by either party. Because we find no error to justify departing from the outcome the court has reached, we affirm its reduction of Dairyland's award.

### D. The Court of Federal Claims Committed No Error in Awarding Overhead and G & A Costs

The government also argues that the trial court erred in including within its damages award "indirect overhead

and G & A costs" incurred by Dairyland in support of its post-breach activities.  Appellant Br. 40.

The trial court based its award of overhead damages on testimony that analyzed Dairyland's accounts and determined the portion of its overhead expenses attributable to the breach.  *Trial Op.*, 90 Fed. Cl. at 638. The court accepted this as "a foundation sufficient to award overhead and G & A costs to Plaintiff."  *Id.*  The government disputes this holding.  It argues that Dairyland failed to show that these costs were actually caused by the government's breach, and suggests that the costs—at least some portion of them—would have been incurred absent breach.  It points out that Dairyland offered the trial court only a post hoc computation of its overhead and G & A costs (Dairyland does not allocate such costs during the normal course of business).  The government also recites various cost categories which, in its view, should not have been included in the computation, such as "costs associated with Dairyland's performance administration, plant operations, integrated planning, marketing and development, procurement, and headquarters cafeteria cost centers[,]" "management and other administrative tasks supporting Dairyland as a whole" "[and] interest and depreciation on Dairyland's headquarters facility."  Appellant Br. 43.

It is well-settled that a plaintiff is entitled to recover costs actually caused by the defendant's breach.  *Energy Nw.*, slip op. at 17 (citing *Ind. Mich. Power*, 422 F.3d at 1373).  The government argues that Dairyland failed to prove causation; the trial court disagreed.  In matters concerning the sufficiency of proof on such a question, we defer to the judgment of the trial court absent clear error. Here, the court agreed with Dairyland that these expenses represented "resources that are consumed

because of the consumption of breach related activities[.]" *Trial Op.*, 90 Fed. Cl. at 638 (quoting Dairyland's expert witness). In other words, to execute on its mitigation activities, Dairyland provided its employees a variety of overhead services. To award a portion of those expenses attributable to the breach was consistent with this court's precedent, and we see no error in the court's acceptance of Dairyland's evidence. *See Energy Nw.*, slip op. at 17–18 (affirming award of overhead expenses where plaintiff had proved the proper apportionment of those expenses via expert testimony); *Carolina Power*, 573 F.3d at 1276–77.

We therefore agree with the Court of Federal Claims' overall reasoning in its award of overhead and G & A expenses, and we affirm its award of those expenses as part of the costs of SNF storage.[5]

### E. The Court of Federal Claims Was Required to Award the Costs of Dairyland's PFS Investment Only to the Extent Those Costs Were Taken for Mitigation

Finally, we turn to the government's contention that the trial court erred in awarding Dairyland the entire cost of its investment in PFS, including both money contributed via GFT into PFS, expenses incurred on GFT's behalf for PFS, and (as already discussed) various overhead and G & A expenses.

---

[5] As discussed *infra*, we are remanding for further development the question of how much of the investment in PFS is recoverable. We expect remand proceedings will include determination of how much of the overhead and G & A expenses associated with PFS are recoverable. We therefore vacate the award of overhead and G & A expenses as to the PFS investment.

The government does not contend that it was unreasonable or unforeseeable that Dairyland would seek interim off-site storage for its SNF. Nor does it argue that Dairyland was not entitled to collaborate with other nuclear utilities to aggregate the costs of such storage. The problem with the trial court awarding Dairyland the full cost of its participation in PFS, according to the government, concerns the size and the specific manner of that participation.

The government presents two arguments.

### 1. No Error in Taking GFT's Investment in PFS as the Baseline for Computing Damages

First, the government points out that the actual investor in PFS was not Dairyland but its wholly-owned subsidiary GFT. Dairyland owns no PFS shares in its own right and has contributed no capital directly to PFS. The government argues that the trial court improperly conflated the two entities, Dairyland and GFT. To the extent a claim exists for investment in PFS, the government would limit that claim to GFT alone. It argues that if Dairyland has any claim at all, it is for its investment in GFT—not GFT's investment in PFS. Appellee Br. 27. The government argues that Dairyland failed to press this claim—and argues that it would not be recoverable anyway, as it views use of a wholly-owned intermediary such as GFT as unforeseeable at the time of contracting.

The trial court rejected this line of argument and so do we. The record demonstrates—and the government does not dispute—that GFT had no practical purpose but to be a conduit for Dairyland's investment in PFS. *See SJ Denial*, 82 Fed. Cl. at 383 ("GFT had no assets other than

those provided by Dairyland for the sole purpose of investing in PFS.").  The parties agree that the amount Dairyland contributed into GFT equals the amount GFT invested in PFS.  *See id.*; *see also* Oral Argument at 2:18, *Dairyland Power Coop. v. United States*, (No. 2010-5110, -5111), *available at http://oralarguments.cafc.uscourts.gov/Audiomp3/2010-5110.MP3* (government conceding that the amounts are equal).  And there is no dispute that GFT was at all times wholly owned and controlled by Dairyland.

The authority cited by the government is unpersuasive.  Several are cases where individual shareholders attempted to assert claims properly belonging to the corporation, and were rebuffed.  *See, e.g.*, *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005); *S.R. Weinstock & Assocs. v. United States*, 223 Ct. Cl. 633, 680 (Ct. Cl. 1980).  Those cases are not applicable here, both because Dairyland's relationship with GFT is far different from that of an individual shareholder and because Dairyland, not GFT, has a privity relationship with the government.  Nor does the government's citation to *American Capital Corp. v. Federal Deposit Insurance Corp.*, 427 F.3d 859, 864–66 (Fed. Cir. 2006), aid its cause.  There, this court rejected a parent corporation's attempt to assert a claim properly belonging to its subsidiary in a *Winstar*-type case.  *See generally United States v. Winstar Corp.*, 518 U.S. 839 (1996) (holding the government liable for contractual breach associated with certain financial reform legislation).  In *American Capital*, again unlike here, it was the subsidiary that had the contractual relationship with the government, and this court held that the parent could not assert the subsidiary's cause of action.  472 F.3d at 866–67.  Here, it is the parent with the privity relationship, seeking to recover its own investment,

computed based on the flow of capital through a specially-created subsidiary. *American Capital* is therefore distinguishable. We see no problem with the trial court's method of computing Dairyland's damages by looking at the investment made by GFT on Dairyland's behalf.

### 2. Investment in PFS is Recoverable Only to the Extent It Was for Mitigation

The government's second argument fares better. It argues that Dairyland's investment in PFS was more profit speculation than mitigation, and so should not be recoverable as a matter of law. The government points out that PFS was conceived as a for-profit venture (though it has yet to actually turn a profit). It notes that Dairyland stands to profit if and when PFS becomes commercially successful. And it argues that the size of Dairyland's investment in PFS far outstrips Dairyland's actual need for off-site interim storage.

As already discussed, Dairyland has 38 metric tons of SNF to store. The government cites testimony that, using standard storage casks of the type it expects PFS will use, this would require six casks. By contrast, the government argues that PFS's interim storage facility, when built, will have a storage capacity of 4,000 casks. Appellee Br. 33–34. The government points to trial testimony that Dairyland was a 13.5% owner in PFS. From this, the government reasons that Dairyland had proportional ownership of 13.5% of PFS's expected 4,000 storage casks, about 540 total casks. The government points out that this amount of storage dramatically exceeds Dairyland's storage requirements. From this, the government argues that the investment in PFS is not recoverable or, if it were, the trial court should have either performed an accounting of the value of Dairyland's PFS stake or

ordered disgorgement of the shares to avoid unjust enrichment. The government further notes that this court has previously held a nuclear utility's investment in PFS to be nonrecoverable as speculative and unforeseeable. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1376 (Fed. Cir. 2005).

Dairyland opposes, arguing first that *Indiana Michigan* should be limited to its facts. It argues that the evidence here demonstrates, and the trial court held, that it was both reasonable and foreseeable for Dairyland to collaborate with other nuclear utilities to reduce the overall cost of interim off-site storage. In that light, Dairyland argues that the exact manner of the collaboration—in this case, equity participation in PFS—is not required to be foreseeable. Dairyland further argues that the ownership structure and division of revenue in PFS is more complex than the government's arithmetic suggests. Finally, Dairyland notes that PFS's facility has not yet been built, nor has it ever turned a profit.

The government is correct that expectation damages are available to compensate a plaintiff for the cost of actions taken in mitigation, and not for speculative ventures. This is an extension of the requirement that damages are recoverable only to the extent the non-breaching party can show that the damages were actually caused by the breach. *Ind. Mich. Power*, 422 F.3d at 1376; *see also Energy Nw.*, slip op. at 12–13; *S. Nuclear*, slip op. at 13.

While we decline to enter into fact-finding, we agree with the government that the facts of this case urge caution. The government having raised the specter of a bounty accruing to Dairyland from its PFS investment,

Dairyland had the burden to prove how much, if any, of its PFS investment was speculative as opposed to mitigation-oriented. The government, of course, was entitled to contest that proof, and the trial court to determine which party the evidence best favored.

Faced with these arguments, the Court of Federal Claims concluded that it was not required to apply this level of detailed inquiry to the causation analysis. *Trial Op.*, 90 Fed. Cl. at 651. We disagree as a matter of law and so vacate the award of damages for the PFS investment and remand for further development. In so doing, we emphasize that we draw no conclusions as to the ultimate outcome of the trial court's inquiry. It is that court's role, not ours, to determine in the first instance the amount to offset Dairyland's award of its PFS investment to account for speculation (if indeed there was speculation).[6]

## III. CONCLUSION

For the foregoing reasons, we affirm the Court of Federal Claims' award of damages based on Dairyland's "exchange" model and its reasoning in awarding overhead and G & A costs. We also affirm its discounting of damages for the cost of the year-one delivery commitment schedules, which Dairyland raised on cross-appeal. We vacate those portions of the award concerning Dairyland's investment in PFS and remand for further proceedings.

---

[6] As noted *supra* note 5, the Court of Federal Claims' determination on remand should include an assessment of the extent, if any, to which the award of overhead and G & A expenses associated with the PFS investment should be offset.

COSTS

Each party shall bear its own costs.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND
REMANDED**